Ben **HARRIS** and Shirley Harris, Plaintiffs,

v.

**KEY BANK NATIONAL ASSOCIATION, d/b/a Key Bank, Key Bank of New York, and Key Bank of Central New York, Defendant.**

No. 98–CV–6044L.

United States District Court, W.D. New York.

March 14, 2000.

Mark J. Moretti, Rochester, NY, Leslie N. Reizes, Friedlander, Friedlander, Reizes and Joch, Ithaca, NY, John M. McGovern, Duluth, GA, for Ben Harris, plaintiff.

Mark. J. Moretti, Rochester, NY, for Key Bank National Association, Key Bank

of New York, and Key Bank of Central New York, defendant.

### DECISION AND ORDER

LARIMER, Chief Judge.

Plaintiffs Ben and Shirley Harris ("plaintiffs"), pursuant to this court's diversity jurisdiction under 28 U.S.C. § 1332, commenced this action against defendant Key Bank National Association, d/b/a Key Bank, Key Bank of New York, and Key Bank of Central New York ("defendant" or "Key Bank" or "the bank"). In their complaint, plaintiffs allege essentially that Key Bank mishandled collateral that plaintiffs had pledged to secure a loan. Defendant moves to dismiss this action for failure to state a claim upon which relief can be granted, which motion was converted to a motion for summary judgment.

### FACTUAL BACKGROUND

In June 1984, plaintiffs sold an apartment building located at 1564 St. Paul Street to a general partnership called the 1564 St. Paul Street Partners ("partners").[1] As part of the $775,000 purchase price, the partners executed a promissory note for the benefit of plaintiffs in the amount of $195,000 ("St. Paul Street Note"). As security for this note, the partners gave plaintiffs a second mortgage on the property. According to the terms of the St. Paul Street Note, the partners would pay only interest to plaintiffs, in monthly installments of $1,900, until April 1991. The partners would then pay the principal of $195,000, in a balloon payment, on May 1, 1991.

On May 30, 1985, in a completely separate transaction, plaintiffs borrowed $150,-000 from Key Bank. Plaintiffs executed a demand note for the benefit of the bank in the amount of $150,000 ("Key Bank Note"). As security for this note, plaintiffs assigned to Key Bank their $195,000 St. Paul Street Note and the second mortgage interest that secured it.

In 1986, plaintiffs began having difficulty making the monthly payments on the Key Bank Note. As a result, plaintiffs made arrangements for the partners to send their monthly interest payments on the St. Paul Street Note directly to Key Bank. The bank agreed to apply those payments to plaintiffs' Key Bank Note debt. The bank also agreed to amortize the Key Bank Note over five years so that it would mirror the term of the St. Paul Street Note. Consequently, the Key Bank Note balance would be due at the same time the St. Paul Street Note principal payment was due. Plaintiffs allege that Key Bank agreed further that when it received the $195,000 principal payment from the partners, it would use that money to pay off the outstanding balance on the Key Bank Note and then return any remaining money to plaintiffs, along with their assigned collateral.

This arrangement worked well for approximately five years. However, just before the principal payment on the St. Paul Street Note was due, the partners approached Key Bank for a $195,000 loan so that they could refinance the money owed plaintiffs. Key Bank refused to loan the partners the money. Therefore, when the principal payment came due, the partners were unable to pay it. The partners offered to continue making monthly interest payments until they could afford the $195,-000 principal payment. Plaintiffs agreed not to immediately enforce the St. Paul Street Note, and the bank agreed to continue to apply the partners' monthly interest payments to the Key Bank Note. This arrangement worked well for another two and one-half years, at which time there was only a $75,000 balance remaining on

---

1. The individual partners of this partnership are Sanford Liebschutz, Esq., Edward J. After, Esq., Martin L. Schuster, Esq., Jack Schuster, Esq., and Belle Schuster. The general partner of this partnership is Schapiro Associates, which is comprised of Marc Schapiro, Esq. and Jane Schapiro.

the Key Bank Note, and the bank was oversecured by about $120,000 (the difference between the $195,000 pledged St. Paul Street Note and the unpaid $75,000 Key Bank Note).

By January 1994, however, the partners had been remitting payments late on the St. Paul Street Note. Further, plaintiffs' attorney, David Berlowitz, learned that the senior mortgage holder intended to foreclose on the property because of an unpaid tax bill. Berlowitz wrote to the bank's loan officer, Gary Wernz, and asked Key Bank to join plaintiffs in suing the partners for the $195,000 principal payment. Wernz responded that he was looking for the file and would get back to Berlowitz once he found it. Plaintiffs maintain, however, that Wernz had the file at all times and was secretly corresponding with the partners. Instead of getting back to Berlowitz, as promised, Wernz simply sold the Key Bank Note to the partners for the $75,000 balance.

Wernz then informed plaintiffs that the bank had sold the Key Bank Note, along with the $195,000 St. Paul Street Note and the second mortgage interest that secured it, to a partnership called "Last" Associates. At no time did Wernz mention the partners' involvement in this transaction. Berlowitz knew that the name Last Associates had been used for many years by a respected realtor, Lawrence Dresner. Berlowitz contacted Dresner, who knew nothing about the transaction. Berlowitz then contacted Wernz again to inquire about this unusual situation. At around this time, it appears that the partners reserved another business name similar to Last Associates—Lass Associates—and changed the name on all the closing documents. *See* Plaintiffs' Affidavit (Docket Item 11) Ex. I (Letter to plaintiffs from partners' attorney noting name change). Wernz then allegedly told plaintiffs that he simply had made a mistake regarding the name of the entity purchasing the Key Bank Note.

By letter dated April 4, 1994, the partners' attorney, Stanley Gordon, on behalf of Lass Associates, demanded that plaintiffs pay the $75,000 balance on the Key Bank Note within fifteen days. When plaintiffs failed to do so, Gordon personally served on plaintiffs written notice, pursuant to U.C.C. § 9–505(2), that Lass Associates proposed to retain the assigned collateral—*i.e.*, the St. Paul Street Note and second mortgage—in full satisfaction of the Key Bank Note.[2] Plaintiffs maintain that they could not afford to remit payment to Lass Associates. According to plaintiffs, they had been waiting for the partners' $195,000 principal payment so that they could pay off the Key Bank Note balance. Plaintiffs allege further that they told Berlowitz to object to the Lass Associates' proposal to keep the collateral in full satisfaction of the debt. Berlowitz, however, apparently never sent the objection. Consequently, the partners foreclosed upon the Key Bank Note and retained the collateral.

Plaintiffs immediately sued the partners in New York State Supreme Court, Monroe County, to enforce the St. Paul Street Note. The state court ruled that since the bank had repledged the Key Bank Note to Lass Associates and Lass Associates had foreclosed on that note, Lass Associates was now the owner of the St. Paul Street Note, and plaintiffs did not have standing to enforce it.

---

**2.** U.C.C. § 9–505(2) provides that "[i]n any other case involving consumer goods or any other collateral a secured party in possession may, after default, propose to retain the collateral in satisfaction of the obligation. Written notice of such proposal shall be sent to the debtor.... If the secured party receives objection in writing from a person entitled to receive notification within twenty-one days after the notice was sent, the secured party must dispose of the collateral under Section 9–504. In the absence of such written objection the secured party may retain the collateral in satisfaction of the debtor's obligation." U.C.C. § 9–504 provides for the disposition of collateral by a public or private sale. Any surplus realized from that sale is returned to the debtor. U.C.C. § 9–504(2).

In the instant action, plaintiffs maintain that Key Bank's conduct constituted: (1) negligence, in violation of U.C.C. § 9–207;[3] (2) a breach of the bank's fiduciary duty; (3) a breach of good faith, in violation of U.C.C. § 1–203;[4] and (4) constructive fraud.[5] Specifically, plaintiffs contend that Key Bank breached duties owed to them when it ignored Berlowitz's plea to sue the partners to enforce the St. Paul Street Note and instead entered into a clandestine agreement with those same partners to sell them the Key Bank Note. Plaintiffs claim that the bank should have treated the $75,000 from the partners as a payment on the St. Paul Street Note, applied it to pay off the Key Bank Note debt, and then returned plaintiffs' pledged collateral to them. Instead, according to plaintiffs, the bank recklessly transferred away plaintiffs' pledged St. Paul Street Note, which was worth about $120,000 more than plaintiffs' Key Bank Note debt, to the very same people who were supposed to pay it, all while creating a pretext that a different entity had purchased the note. Plaintiffs maintain that Key Bank ruined the relationship between plaintiffs and the partners and seriously jeopardized plaintiffs' ability to enforce the St. Paul Street Note.

As damages, plaintiffs seek $1,000,000 actual damages and $5,000,000 punitive damages for: (1) losing the value of their $195,000 pledged promissory note; (2) loss of the value of other real estate that they were forced to sell at a discounted price when they did not receive the $120,000 to maintain it; (3) being financially forced to uproot themselves and their immediate family from their home, and incurring moving expenses; (4) incurring high finance expenses to borrow the $120,000

that they had anticipated receiving from the partners; (5) being unable to retire, as they had planned to do upon receipt of the $120,000; and (6) deteriorating physical and mental health.

Defendant moves to dismiss the complaint, on the following grounds: (1) Key Bank had a legal right to freely transfer the Key Bank Note and the pledged collateral to Lass Associates; (2) the doctrines of res judicata and collateral estoppel bar this action based on the prior state court judgment; (3) plaintiffs' failure to respond to the U.C.C. § 9–505 proposal letter constitutes a waiver of any claim to the surplus value of the St. Paul Street Note; and (4) plaintiffs have failed to plead all the necessary elements with sufficient particularity to state a claim for constructive fraud.

## DISCUSSION

### I. Claim Under U.C.C. § 9–207

█ Under both the U.C.C. and common law, a "secured party must use reasonable care in the custody and preservation of collateral in his possession," and a "secured party is liable for any loss caused by his failure to meet [this] obligation." U.C.C. § 9–207(1), (3); *see also Bank of China v. Chan*, 937 F.2d 780, 783 (2d Cir.1991); *Marine Midland Bank v. CMR Indus.*, 159 A.D.2d 94, 102, 559 N.Y.S.2d 892 (2d Dep't 1990). In addition, "[w]here commercial paper or other securities are placed in the custody and control of the pledgee, it is clear that his responsibility is not limited solely to the physical preservation of the same. His responsibilities extend to the exercise of such care as a reasonably prudent pledgee would exercise

---

**3.** U.C.C. § 9–207(1) provides that a "secured party must use reasonable care in the custody and preservation of collateral in his possession." In addition, a "secured party is liable for any loss caused by his failure to meet [this] obligation." U.C.C. § 9–207(3).

**4.** U.C.C. § 1–203 provides that "[e]very contract or duty within this Act imposes an obli-

gation of good faith in its performance or enforcement."

**5.** In their complaint, plaintiffs also asserted a cause of action for conversion. Plaintiffs now recognize that this cause of action is time barred and, therefore, have voluntarily withdrawn it.

under like circumstances to protect and preserve the validity and value" of the collateral. *Grace v. Sterling Grace & Co.,* 30 A.D.2d 61, 64, 289 N.Y.S.2d 632 (1st Dep't 1968). The court in *Grace* also stated that "[i]n determining the care to be exercised by a bailee, 'the nature and the value of the property, and the means of protection possessed by the bailee and the relation of the parties and other circumstances must be considered.'" *Id.* at 66, 289 N.Y.S.2d 632 (quoting *Cutting v. Marlor,* 78 N.Y. 454, 458 (1879)).

■ Applying this standard to the case at bar, I find that genuine issues of material fact exist concerning whether defendant breached its duty of care by selling the Key Bank Note to the partners, and that summary judgment is therefore inappropriate. Viewing the evidence in the light most favorable to plaintiffs, the non-moving parties, I believe that a factfinder could reasonably conclude that Key Bank knew or should have known that its sale of the Key Bank Note to the partners effectively destroyed the value of the collateral, *i.e.* the St. Paul Street Note, because that put the partners in position to do precisely what they did here: demand that plaintiffs pay the Key Bank Note in full (which plaintiffs were unable to do, since they had been depending on the partners' payments for that purpose), and then declare that they were going to retain the St. Paul Street Note, which they themselves had issued. At that point, the partners became both the obligors and the obligees on the same note, so that, in their status as obligees, they could simply elect not to enforce their right to "collect" from themselves on the note.

Arguably, it was the partners rather than the bank who were more *directly* responsible for destroying the value of the collateral in this manner. Clearly, however, one could find that Key Bank knew or should have known what the partners' plan was. Since the bank had been involved with both plaintiffs and the partners in the prior arrangements for payment of the Key Bank Note, the bank must have had at least a general idea of the nature of the relationship between plaintiffs and the partners, so the bank might also have realized the partners' motive in obtaining the Key Bank Note and more importantly its collateral, the St. Paul Street Note.

In addition, some of the relevant facts about the circumstances surrounding the bank's sale of the note to the partners are either in dispute or not entirely clear at this point. For instance, it is unclear precisely how this transaction came about. If the evidence at trial shows that the bank approached the partners about selling the Key Bank Note, rather than the other way around, that might be some evidence that the bank understood from the beginning how valuable ownership of that note would be to the partners. Similarly, it is not clear to what extent the bank was aware that the partners' use of a business name, either Last or Lass Associates, prevented plaintiffs from realizing that it was the partners who had purchased the note. The record indicates that Gary Wernz, the account officer on the matter for Key Bank, was aware that the partners were using one or both of those names. *See* Plaintiffs' Affidavit Ex. G. Since Key Bank had known from the beginning that the partners had given plaintiffs the St. Paul Street Note, it is possible that the bank could at least have surmised that the partners were trying to keep their true identity concealed from plaintiffs.

As the court in *Grace* stated, "[i]n determining the care to be exercised by a bailee, 'the nature and the value of the property, and the means of protection possessed by the bailee and the relation of the parties and other circumstances must be considered.'" 30 A.D.2d at 66, 289 N.Y.S.2d 632. Here, the nature of the property and the relation of the parties both suggest that the bank's sale of the Key Bank Note to the partners may have violated its duty to preserve the value of plaintiffs' collateral. While I recognize that the quoted portion of the opinion is taken from a

discussion of common-law principles rather than the U.C.C., I am not convinced that these principles are not applicable under § 9–207 as well. *See Executive Bank of Fort Lauderdale, Florida v. Tighe,* 66 A.D.2d 70, 75–76, 411 N.Y.S.2d 939 (2d Dep't 1978) (taking note of common law in construing U.C.C. provisions, "since they appear in large part to embody common law principles"). As noted earlier, the duty of a secured party to exercise reasonable care in the custody and preservation of collateral is one that exists under both the common law and the U.C.C. *In Matter of Bud–Lee Ski Centers, Inc.,* 116 A.D.2d 715, 716, 497 N.Y.S.2d 768 (2d Dep't 1986).

My finding that these circumstances present an issue of fact finds support in *Chittenden Trust Co. v. Marshall,* 146 Vt. 543, 507 A.2d 965 (1986). In *Chittenden Trust,* the defendant sold his interest in a corporation ("the corporation") to two new stockholders, receiving in return cash plus a $35,000 note secured by a mortgage. He subsequently used the note and mortgage as collateral to secure a $30,000 loan from the plaintiff bank.

About two years later, the bank sued the defendant to recover the balance due on the allegedly delinquent $30,000 note, which the bank had called after the defendant refused the bank's request to increase the amount of collateral. While the suit was pending, the bank assigned its interest in the $30,000 demand note and collateral (*i.e.* the $35,000 note and mortgage) to the corporation in return for payment of the $30,000 note in full. The bank then abandoned its claim against the defendant, and trial went forward solely on the defendant's counterclaims for conversion of the collateral and other claims.

At trial, the court directed a verdict for the defendant on his conversion claim. Although reversing that ruling, the Supreme Court of Vermont nevertheless held that an issue of fact existed as to whether the bank's sale of the $30,000 note and collateral constituted a breach of the bank's duty to exercise reasonable care in the

custody and preservation of the collateral under § 9–207(1), or an impairment of the defendant's right to redeem under § 9–207(2)(e). *Id.* at 548, 507 A.2d 965 (citing *Grace,* 30 A.D.2d at 63–64, 289 N.Y.S.2d 632). The court concluded that this issue should have been submitted to the jury.

Just as in the case at bar, the bank in *Chittenden Trust* sold to the obligors on a demand note another note secured by the very note that the obligors had executed, thereby effectively preventing the secured party from recovering on the note. The Vermont Supreme Court's ruling that this presented a jury issue supports my conclusion that summary judgment in the instant case is inappropriate.

In addition, I note that plaintiffs have submitted an affidavit of Thomas A. Myers, who is the president and chairman of T.A. Myers & Co., a Denver-based firm of certified public accountants and other professionals that specializes in providing consulting and training to lending institutions, government regulators, lending industry trade groups, and other business entities, in the area of reasonable lending practices. Myers has testified before the United States House of Representatives Banking Committee on the responsibility of accountants and other professionals for lending institution failures, and is the author of a number of treatises and articles dealing with the lending industry and related areas.

In his affidavit, Myers opines that Key Bank breached its duty to preserve and protect plaintiffs' collateral, as well as the industry standard of good faith and fair dealing. Specifically, Myers states that Key Bank should have responded to plaintiffs' request to enforce the St. Paul Street Note (which it failed to do), and should have disclosed to plaintiffs that it was negotiating with the partners to sell them the Key Bank Note. Myers Affidavit (Docket Item 17) ¶¶ 13, 14. Myers states that a typical, prudent bank in similar circum-

stances would not have acted as Key Bank did. *Id.* ¶¶ 12, 16, 17.

While Myers's opinion is not conclusive on the issue, I believe that it adds weight to my finding that a question of fact exists as to whether defendant violated its duties under § 9–207. The role of the court on a motion for summary judgment is to determine whether there is a genuine factual issue for trial, not to resolve such issues. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Accordingly, defendant's motion for summary judgment on plaintiffs' U.C.C. claim must be denied.

## II. Breach of Fiduciary Duty

In their second cause of action, plaintiffs allege that defendant, as a trustee of plaintiffs' pledged property, had a fiduciary duty to plaintiffs to protect the property, and that defendant breached that duty by transferring the Key Bank and St. Paul Street Notes to the partners. In response, defendant does not appear to dispute that it did have a fiduciary duty to plaintiffs, but contends that U.C.C. § 9–207 essentially codifies this common law duty. Defendant states that this claim should therefore be dismissed for the same reasons given with respect to plaintiffs' claim under § 9–207.

As already stated, defendant's duty to handle the collateral in a manner that does not destroy or impair its value does exist both at common law and under the U.C.C., and the principles concerning that duty are indeed largely, if not entirely, the same under both. *Bud–Lee Ski Centers*, 116 A.D.2d at 716, 497 N.Y.S.2d 768. For the reasons stated concerning plaintiffs' U.C.C. claim, then, I find that there are genuine issues of material fact concerning whether defendant violated its fiduciary duty when it sold the Key Bank Note and collateral to the partners. Defendant's motion for summary judgment on this claim is therefore denied as well.

## III. Breach of Duty of Good Faith

Plaintiffs also allege that Key Bank violated its duty to perform under its pledge agreement with plaintiffs by transferring the notes to the partners. Again, defendant does not deny that a general duty of good faith is implied in all contracts, but contends that it did not violate this duty, primarily because nothing in the parties' contract prohibited defendant from assigning its rights under the contract to a third party.

"[T]he duty of good faith and fair dealing between the parties to a contract is well recognized" under New York law. *Mark Patterson, Inc. v. Bowie*, 237 A.D.2d 184, 186, 654 N.Y.S.2d 769 (1st Dep't 1997) (citing *New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 318, 639 N.Y.S.2d 283, 662 N.E.2d 763 (1995) ("implicit in every contract is a covenant of good faith and fair dealing")). This common-law principle is also codified by the U.C.C. *See* U.C.C. § 1–203 ("Every contract or duty within this Act imposes an obligation of good faith in its performance or enforcement").

Although defendant is correct that "this duty will not be expanded to a point of conflict with the express terms of the bargained-for exchange," *Mark Patterson*, 237 A.D.2d at 186, 654 N.Y.S.2d 769, I am not persuaded here that plaintiff's claim is necessarily based upon an alleged duty that is inconsistent with the parties' loan contract. The general rule is that "equitable considerations will not allow an extension of coverage beyond [the agreement's] fair intent and meaning in order to obviate objections which might have been foreseen and guarded against." *Caporino v. Travelers Ins. Co.*, 62 N.Y.2d 234, 239, 476 N.Y.S.2d 519, 465 N.E.2d 26 (1984). I am not prepared to rule as a matter of law that plaintiffs should have foreseen the possibility that Key Bank would end up selling the Key Bank Note, which was secured by the St. Paul Street Note, to the partners, thereby effectively destroying plaintiffs' ability to collect on the St. Paul Street Note. Carrying defendant's reason-

ing to its extreme, one could argue that since nothing in the parties' contract expressly stated that Key Bank was forbidden from physically destroying the St. Paul Street Note, it could have done so with impunity without violating its duty of good faith.[6]

Defendant also notes that there was nothing that barred Key Bank, upon plaintiffs' default on the Key Bank Note, from enforcing its own rights in the collateral. Defendant argues that it was therefore free to assign its rights to a third party which in turn enforced those rights against plaintiffs. That assumes, however, that plaintiffs would have failed to object under U.C.C. § 9–505, which, had they done so, would have required the bank to sell the collateral in a commercially reasonable manner pursuant to § 9–504, with any surplus over $75,000 going to plaintiffs.

Defendant's argument assumes that because plaintiffs omitted to object when the partners sent them notice under § 9–505, they would have failed to object had the bank done so as well. While a jury might find such an argument persuasive, I am not prepared to rule as a matter of law that events would have unfolded as defendant suggests. The dates, people, and events would not have been exactly the same, and it is entirely possible that plaintiffs would have objected had Key Bank proposed to retain the collateral in satisfaction of plaintiffs' debt.

Moreover, defendant's scenario is simply *not* what happened here. Whether the bank or some other third party could lawfully have foreclosed and retained the St. Paul Street Note, the fact of the matter is

that Key Bank transferred it and the Key Bank Note to the obligors on the St. Paul Street Note, who obviously had no incentive whatsoever to "enforce" that note and turn over any surplus to plaintiffs. In short, this claim presents issues of fact as well.

## IV. Constructive Fraud

Plaintiffs' final claim is that Key Bank committed constructive fraud by making various misrepresentations to plaintiffs. Specifically, they allege that Wernz told plaintiffs that he would respond to their request that plaintiffs and the bank sue the partners, when in fact he had no intention of doing so, having already begun negotiating with the partners to sell them the Key Bank Note. Plaintiffs also allege that the bank participated in the partners' denomination of themselves as "Last Associates," causing plaintiffs to believe that the bank was transferring the note to a legitimate business entity.

In its reply memorandum of law, defendant takes the position that plaintiffs have abandoned this claim, since their brief in opposition to defendant's motion for summary judgment does not address defendant's previously-made arguments concerning the fraud claim.[7] Although I will not dismiss this claim for that reason alone, I do find that it is fatally flawed and must be dismissed.

Under New York law, "constructive fraud" has been defined as "a breach of duty which, irrespective of moral guilt and intent, the law declares fraudulent because of its tendency to deceive, to violate a confidence or to injure public or private

---

**6.** I recognize that such an act would already be prohibited by § 9–207, but that is precisely the point. The U.C.C. not only prohibits a secured party from impairing collateral, it imposes upon all parties to a contract a duty of good faith. Thus, the mere fact that a contract does not explicitly bar a party from taking a certain action does not absolve the party from liability for acts that are inconsistent with its duties under the U.C.C. and common law.

**7.** Plaintiffs' original memorandum of law made in opposition to defendant's motion to dismiss the complaint under Fed.R.Civ.P. 12(b)(6) did address the fraud claim. At oral argument of that motion, I informed counsel for both sides that I was converting the motion into a motion for summary judgment, and gave them an opportunity to submit additional briefs. Plaintiffs' subsequent brief does not discuss the fraud claim.

interests which the law deems worthy of special protection." *Brown v. Lockwood,* 76 A.D.2d 721, 730, 432 N.Y.S.2d 186 (2d Dep't 1980). To establish a cause of action for constructive fraud in New York, a plaintiff must demonstrate that:

> (1) a representation was made, (2) the representation dealt with a material fact, (3) the representation was false, (4) the representation was made with the intent to make the other party rely upon it, (5) the other party did, in fact, rely on the representation without knowledge of its falsity, (6) injury resulted and (7) the parties are in a fiduciary or confidential relationship.

*Del Vecchio v. Nassau County,* 118 A.D.2d 615, 618, 499 N.Y.S.2d 765 (2d Dep't 1986).

▇▇▇ Here, plaintiffs rely on Wernz's failure to inform them that Key Bank was negotiating to sell the notes to the partners, or the true identity of Last, or Lass, Associates. First, as to Wernz's failure to tell plaintiffs that Key Bank was negotiating with the partners, I believe that this simply forms part of plaintiffs' other claims. A duty to disclose can arise where: (1) one party to a transaction has superior knowledge of certain information; (2) that information is not readily available to the other party; and (3) the first party knows that the second part is acting on the basis of mistaken knowledge. *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank,* 57 F.3d 146, 155 (2d Cir.1995); *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank,* 731 F.2d 112, 123 (2d Cir.1984). Leaving aside the fact that plaintiffs' claim is that they did *not* "act" as a result of their lack of knowledge, they have not alleged what it is they would have done had they known that the bank was negotiating with the partners. The bank could still have gone ahead with the sale just as it did. Plaintiffs simply make the conclusory allegation that they were damaged by Wernz's silence, but have presented no evidence supporting that allegation.

Likewise, plaintiffs fail to show how they were damaged by the bank's alleged collusion with the partners in their use of the names Last and Lass Associates. By the time plaintiffs learned that the St. Paul Street Note had been sold to this purported entity, it was too late to shut the proverbial barn door; the damage had been done. Plaintiff may have sued the partners sooner than they did, but there is no reason to think that the outcome would have changed.

Based on these flaws, as well as plaintiffs' complete failure to address these issues or anything else relating to their constructive fraud claim in their brief in opposition to defendant's motion for summary judgment, I will grant defendant's motion as to this claim.

## V. Other Issues

Defendant also raises certain arguments that apply to all of plaintiffs' claims in general. In particular, defendant contends that plaintiffs' claims are barred under the doctrines of res judicata and collateral estoppel by virtue of the October 26, 1995 decision of the New York Supreme Court finding that plaintiffs lacked standing to enforce the St. Paul Street Note, and that plaintiffs' own failure to object to the partners' proposal to retain the collateral in satisfaction of plaintiffs' obligations under the Key Bank Note was the sole proximate cause of plaintiffs' alleged damages.

▇▇▇ Under the full-faith-and-credit statute, 28 U.S.C. § 1738, federal courts must give the same effect to a state court judgment that that judgment would be given by the courts of the state in which the judgment was rendered. "Under New York law, the doctrine of collateral estoppel, or issue preclusion, applies when a litigant in a prior proceeding asserts an issue of fact or law in a subsequent proceeding and (1) the issue 'has necessarily been decided in the prior action and is decisive of the present action,' and (2) there has been 'full and fair opportunity to contest the decision now said to be controlling.'" *Giakoumelos v. Coughlin,* 88 F.3d

56, 59 (2d Cir.1996) (quoting *Schwartz v. Public Administrator*, 24 N.Y.2d 65, 71, 298 N.Y.S.2d 955, 246 N.E.2d 725 (1969)).

Under the doctrine of res judicata or claim preclusion, a judgment on the merits by a court of competent jurisdiction will be regarded as the full measure of relief to be accorded between the parties on the same cause of action. *Murphy v. Gallagher*, 761 F.2d 878, 879 (2d Cir.1985). New York has adopted a transactional analysis approach in determining the scope of res judicata. *Gargiul v. Tompkins*, 790 F.2d 265, 269 (2d Cir.1986) (citing *Reilly v. Reid*, 45 N.Y.2d 24, 29–30, 407 N.Y.S.2d 645, 379 N.E.2d 172 (1978)). Under this approach, if the claim asserted in the second forum arises from the same "factual grouping" that gave rise to the claim in the first forum, the subsequent claim is barred, regardless of whether the two suits are based on different legal theories or seek different remedies. *Smith v. Russell Sage College*, 54 N.Y.2d 185, 192, 445 N.Y.S.2d 68, 429 N.E.2d 746 (1981); *Reilly*, 45 N.Y.2d at 29–30, 407 N.Y.S.2d 645, 379 N.E.2d 172. In New York, then, "once a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred...." *O'Brien v. City of Syracuse*, 54 N.Y.2d 353, 357, 445 N.Y.S.2d 687, 429 N.E.2d 1158 (1981).

I find that neither of these doctrines is applicable in this action. The state court's decision did not even address the propriety of Key Bank's actions. *See* Defendant's Motion to Dismiss Ex. C. Simply because that court found that the partners were the owners of the Key Bank Note and that they justly retained the collateral does not implicitly mean that he found Key Bank's sale of the note to be lawful in every respect or not violative of any of its duties to plaintiffs. In short, the parties and issues in the state court action were different from those presented here, and the state court decision does not bar plaintiffs from asserting claims against the bank.

I also reject defendant's argument that the court should find as a matter of law that plaintiff's failure to object to the partners' notice under § 9–505 constitutes the sole, or a superseding, proximate cause of plaintiffs' alleged injuries. Had plaintiffs objected, the partners would have been required by that section to sell the collateral and deliver any surplus to plaintiffs, but it is not apparent what the result would have been or whether plaintiffs would have been made whole. I therefore find that in this case, as in many others, the question of proximate cause must be decided by a jury rather than the court. *See, e.g., Khadem v. Fischer & Kagan*, 215 A.D.2d 441, 443, 626 N.Y.S.2d 500 (2d Dept.1995) (holding that issue of fact on proximate cause existed where law firm, knowing of defendant's financial difficulties, delayed prosecuting an action for five years and defendant then filed for bankruptcy, resulting in near certainty that plaintiff, as an unsecured creditor, would receive nothing on his claim); *Lizzio v. County of Onondaga*, 170 A.D.2d 1000, 566 N.Y.S.2d 900 (4th Dep't 1991) ("proximate cause is almost always a triable issue of fact"); *Rotz v. City of New York*, 143 A.D.2d 301, 304, 532 N.Y.S.2d 245 (1st Dep't 1988) ("Issues of ... proximate cause involve the kinds of judgmental variables which have traditionally, and soundly, been left to the finders of fact to resolve even where the facts are essentially undisputed").

## CONCLUSION

Defendant's motion for summary judgment (Docket Item 4) is granted in part and denied in part. Defendant's motion to dismiss Count V of the complaint, for constructive fraud, is granted. In all other respects, defendant's motion is denied.

IT IS SO ORDERED.