Ben HARRIS, Shirley Harris,
Plaintiffs,

v.

KEY BANK NATIONAL ASSOCIATION, d/b/a Key Bank,
et al., Defendants.

No. 98–CV–6044L.

United States District Court,
W.D. New York.

Jan. 15, 2002.

National Association, d/b/a Key Bank, Key Bank of New York, and Key Bank of Central New York ("Key Bank" or "the bank"), and third-party defendants 1564 St. Paul Street Partners, Lass Associates a/k/a "Last Associates," Sanford Liebschutz, Edward J. After, Martin L. Schuster, Jack Schuster and Bell Schuster ("the partners"). The complaint asserts various claims under New York law against Key Bank, all relating in one way or another to plaintiffs' allegation that Key Bank mishandled collateral that plaintiffs had pledged to secure a loan, causing plaintiffs to lose the value of the collateral, and to suffer various other consequential damages.

On March 14, 2000, the court issued a Decision and Order which granted in part Key Bank's motion for summary judgment by dismissing plaintiffs' claim for constructive fraud, but which denied Key Bank's motion to dismiss plaintiffs' claims for negligence, breach of fiduciary duty, and breach of the duty of good faith. *Harris v. Key Bank Nat. Ass'n,* 89 F.Supp.2d 408 (W.D.N.Y.2000).

Key Bank filed a third-party complaint against the partners on June 2, 2000, alleging three causes of action under New York law for rescission, contribution and indemnity, and unjust enrichment. The partners have now moved for summary judgment dismissing the third-party complaint. Key Bank has cross-moved for summary judgment dismissing plaintiffs' remaining claims.

Leslie N. Reizes, Friedlander, Friedlander, Reizes and Joch, Ithaca, NY, John M. McGovern, Duluth, GA, for plaintiffs.

Mark J. Moretti, Rochester, NY, Beryl Nusbaum Woods, Oviatt, Gilman, Sturman & Clarke Rochester, NY, for defendants.

## DECISION AND ORDER

LARIMER, Chief Judge.

### INTRODUCTION AND PROCEDURAL BACKGROUND

This is a diversity action arising out of a series of related financial transactions among plaintiffs, Ben and Shirley Harris, defendant/third-party plaintiff Key Bank

### FACTUAL BACKGROUND

The relevant facts are fully set forth in my March 14, 2000 Decision and Order, familiarity with which is assumed, and will be only briefly summarized here. In June 1984, plaintiffs sold an apartment building on St. Paul Street in Rochester to the partners. As part of the $775,000 pur-

chase price, the partners executed a promissory note for the benefit of plaintiffs in the amount of $195,000 (the "St. Paul Street Note"). As security for this note, the partners gave plaintiffs a second mortgage on the property.

In May 1985, in a completely separate transaction, plaintiffs borrowed $150,000 from Key Bank. Plaintiffs executed a demand note for the benefit of the bank in the amount of $150,000 ("Key Bank Note"). As security for that note, plaintiffs assigned to Key Bank the $195,000 St. Paul Street Note and the second mortgage interest that secured it.

In time, both the partners and plaintiffs began having difficulty making their monthly payments on their respective notes. For several years, with the blessing of plaintiffs, the partners sent their payments on the St. Paul Street note directly to Key Bank and not to plaintiffs, in order to fulfill the partners' obligation to plaintiffs and plaintiffs' obligation to the bank simultaneously. Various other proposals concerning the parties' obligations were made and considered over the years, but in early 1994, Key Bank sold plaintiffs' Key Bank Note to the partners (doing business as "Lass" or "Last" Associates) for $75,000, which was the remaining balance on the note at that time, along with the $195,000 St. Paul Street Note and the second mortgage interest that secured it.

In April 1994, Lass Associates demanded that plaintiffs pay the $75,000 balance on the Key Bank Note within fifteen days. When plaintiffs failed to do so, Lass Associates served on plaintiffs written notice, pursuant to U.C.C. 9–505(2), that Lass Associates proposed to retain the assigned collateral, i.e., the St. Paul Street Note and second mortgage, in full satisfaction of the Key Bank Note. Plaintiffs neither objected to nor responded to this notice, although it is not entirely clear from plaintiffs' deposition testimony and that of their then-attorney, David Berlowitz, why that was so.

Thereafter, plaintiffs sued the partners in New York State Supreme Court, Monroe County, to enforce the St. Paul Street Note. The state court ruled that since the bank had repledged the Key Bank Note to Lass Associates and Lass Associates had foreclosed on that note, Lass Associates was now the owner of the St. Paul Street Note, and plaintiffs did not have standing to enforce it. Plaintiffs then brought this action against Key Bank, alleging that the bank impaired the value of plaintiffs' collateral when it transferred the collateral and the Key Bank Note to Lass Associates.

## DISCUSSION

### I. Key Bank's Motion for Summary Judgment

#### A. Law of the Case

■ Plaintiffs argue that the court should deny Key Bank's motion for summary judgment based on the "law of the case" doctrine. "The doctrine of the law of the case 'posits that if a court decides a rule of law, that decision should continue to govern in subsequent stages of the same case.'" *Aramony v. United Way of America,* 254 F.3d 403, 410 (2d Cir.2001) (quoting *In re Crysen/Montenay Energy Co.,* 226 F.3d 160, 165 n. 5 (2d Cir.2000), *cert. denied,* 532 U.S. 920, 121 S.Ct. 1356, 149 L.Ed.2d 286 (2001)). In general, a court "will only reconsider a prior decision in the same case if there has been an intervening change in controlling law, there is new evidence, or a need is shown to correct a clear error of law or to prevent manifest injustice." *United States v. Sanchez,* 35 F.3d 673, 677 (2d Cir.1994), *cert. denied,* 514 U.S. 1038, 115 S.Ct. 1404, 131 L.Ed.2d 291 (1995).

■ This principle must be followed by the district court when an *appellate* court has ruled on a matter of law in the case. *See, e.g., United States v. Minicone,* 994 F.2d 86, 89 (2d Cir.1993), *cert. denied,* 513 U.S. 940, 115 S.Ct. 344, 130 L.Ed.2d 300 (1994). It is discretionary, however, for a court that is considering whether to revisit its *own* prior decisions in the same case. *See, e.g., Lewis v. Whelan,* 99 F.3d 542, 545 (2d Cir.1996); *United States v. Uccio,* 940 F.2d 753, 758 (2d Cir.1991); *Scottish Air Int'l Inc. v. British Caledonian Group, PLC,* 152 F.R.D. 18, 24–25 (S.D.N.Y.1993). In such cases, the application of the law-of-the-case doctrine "does not limit a court's power to reconsider its own decisions prior to final judgment." *Sagendorf–Teal v. County of Rensselaer,* 100 F.3d 270, 277 (2d Cir.1996). *See also In re PCH Assocs.,* 949 F.2d 585, 592 (2d Cir.1991); *DiLaura v. Power Auth. of State of New York,* 982 F.2d 73, 76–77 (2d Cir.1992) (citing cases); *Virgin Atlantic Airways Ltd. v. National Mediation Bd.,* 956 F.2d 1245, 1255 (2d Cir.), *cert. denied,* 506 U.S. 820, 113 S.Ct. 67, 121 L.Ed.2d 34 (1992).

Thus, "unlike the doctrines of res judicata and collateral estoppel, which a court cannot ignore where they apply, the law of the case, as Justice Holmes remarked, 'merely expresses the practice of the courts generally to refuse to reopen what has been decided.'" *Devilla v. Schriver,* 245 F.3d 192, 197 (2d Cir.2001) (quoting *Messinger v. Anderson,* 225 U.S. 436, 444, 32 S.Ct. 739, 56 L.Ed. 1152 (1912)). "It is, 'at best, a discretionary doctrine which does not constitute a limitation on the court's power but merely expresses [this practice].'" *Id.* (quoting *United States v. Williams,* 205 F.3d 23, 34 (2d Cir.), *cert. denied,* 531 U.S. 885, 121 S.Ct. 203, 148 L.Ed.2d 142 (2000)).

■ In the context of renewed motions for summary judgment, the Second Circuit has stated that "the law of the case is not a limit on the court's jurisdiction, but a rule of practice which may be departed from in the sound discretion of the district court," and that "further reflection may allow a better informed ruling in accordance with the conscience of the court." *Corporacion de Mercadeo Agricola v. Mellon Bank Int'l,* 608 F.2d 43, 48 (2d Cir. 1979). The only limitation placed upon the exercise of the court's discretion in this regard is that prejudice not ensue to the party arguing for application of the doctrine. *See First Nat'l Bank v. American Foam Rubber Corp.,* 530 F.2d 450, 453 n. 3 (2d Cir.), *cert. denied,* 429 U.S. 858, 97 S.Ct. 157, 50 L.Ed.2d 135 (1976). In this context, "prejudice" does not mean simply the adverse effect of the ruling itself, but instead "'refers to a lack of sufficiency of notice' or a lack of sufficient 'opportunity to prepare armed with the knowledge that [the prior ruling is not deemed controlling].'" *Uccio,* 940 F.2d at 758 (quoting *United States v. Birney,* 686 F.2d 102, 107 (2d Cir.1982)); *Cumis Ins. Soc., Inc. v. Windsor Bank & Trust Co.,* 736 F.Supp. 1226, 1228 (D.Conn.1990).

■ Applying these principles, courts have declined to apply the law-of-the-case doctrine where a more complete record was developed after the prior ruling was rendered. *See, e.g., Casey v. United States,* 161 F.Supp.2d 86, 92 (D.Conn. 2001); *Washington Nat'l Life Ins. Co. of New York v. Morgan Stanley & Co., Inc.,* 974 F.Supp. 214, 219 (S.D.N.Y.1997). In the case at bar, there has been discovery since the issuance of my March 14, 2000 Decision and Order, and the parties have submitted materials obtained during that discovery, including deposition transcripts, that shed additional light on the issues involved here. Under these circumstances, I believe that it both is within the court's discretion to revisit the issue of

whether the bank is entitled to summary judgment, and advisable to do so.

As stated, another reason to depart from the doctrine is to prevent a "manifest injustice." If a party is indeed entitled to summary judgment, then denying a well-founded Rule 56 motion could work a manifest injustice, by forcing that party to defend against a meritless claim all the way through trial. *See Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985) (noting that among "the salutary purposes of summary judgment" is "avoiding protracted, expensive and harassing trials"). Having considered all the evidence now before the court, I conclude that Key Bank is entitled to summary judgment, which is an additional reason not to apply the law-of-the-case doctrine here.

## B. Merits of Key Bank's Motion

After reviewing the record, I find that Key Bank is entitled to summary judgment. The undisputed facts show that the alleged injury to plaintiffs was caused not by any wrongful action of the bank, but by plaintiffs' own failure to object or otherwise respond to Lass Associates' proposal to keep the collateral, *i.e.*, the St. Paul Street Note and second mortgage, in full satisfaction of plaintiffs' debt on the Key Bank Note.

At his deposition, plaintiff Ben Harris testified that after plaintiffs received Lass Associates' notice under Uniform Commercial Code ("U.C.C.") § 9–505(2)[1], plaintiffs "told [their] attorney to reject it." Key Bank's Appendix of Exhibits ("App."), Ex. B at 105. He stated that he understood the implication of the warning contained in the notice that Lass Associates would retain the St. Paul Street Note and mortgage if plaintiffs did not respond within twenty-one days. *Id.* at 106.

Shirley Harris testified in similar fashion. At her deposition, she gave the following testimony:

Q. You realize there were fairly serious implications in not sending that letter

1. At the time of the events giving rise to this action, § 9–505(2) provided that in a case involving consumer goods or any other collateral a secured party in possession may, after default, propose to retain the collateral in satisfaction of the obligation. Written notice of such proposal shall be sent to the debtor if he has not signed after default a statement renouncing or modifying his rights under this subsection. In the case of consumer goods no other notice need be given. In other cases notice shall be sent to any other secured party from whom the secured party has received (before sending his notice to the debtor or before the debtor's renunciation of his rights) written notice of a claim of an interest in the collateral. If the secured party receives objection in writing from a person entitled to receive notification within twenty-one days after the notice was sent, the secured party must dispose of the collateral under Section 9–504. In the absence of such written objection the secured party may retain the collateral in satisfaction of the debtor's obligation.

In 2001, many of the provisions of N.Y. U.C.C. Art. 9 were amended and recodified. In particular, the subject matter formerly covered in § 9–505 is now contained in § 9–620. The new § 9–620 has not only preserved the availability of strict foreclosure following default by the debtor, but has in some respects simplified the procedure involved, by "eliminating the need (but preserving the possibility)" for the creditor first to send the debtor a "proposal" that the creditor retain the collateral in satisfaction of the debtor's obligation. Official Comment to N.Y. U.C.C. § 9–620. The Official Comment to the new section states that it "reflects the belief that strict foreclosures should be encouraged and often will produce better results than a disposition for all concerned." *Id.*

While these amendments, then, have not restricted the use of strict foreclosure in any event, because they became effective on July 1, 2001, they have no bearing on plaintiffs' rights at the time of the events underlying this lawsuit. All subsequent references to U.C.C. sections in this Decision and Order are to the provisions as they existed at the time of the relevant events.

[that Ben Harris had drafted, rejecting Lass Associates' proposal] out?

A. Yes sir, I do.

Q. You do now, right?

A. I did then.

App., Ex. C at 77. She testified that after plaintiffs received the notice from Lass Associates, she called Berlowitz and told him to reject the proposal. She said that Berlowitz "made light of it," and told her "there's nothing to this . . . ." *Id.* at 78. He also allegedly told her that plaintiffs should have no direct contact with Lass Associates. *Id.*

Shirley Harris also testified that at the time when these events were taking place, she understood that if the Harrises objected to Lass Associates' proposal, Lass Associates would not be able to keep the collateral in satisfaction of the debt. *Id.* at 93. Her testimony was unclear as to why plaintiffs never did respond to the notice, however. She testified that Berlowitz had advised plaintiffs that the notice "couldn't be enforced," *id.* at 96, yet she also stated that plaintiffs did not simply accept what Berlowitz told them in that regard, and that her "feeling was to write the letter [objecting to Lass Associates' proposal] anyway." *Id.*

In fact, Ben Harris did prepare a letter rejecting Lass Associates' proposal, which he gave to Berlowitz for his approval. *Id.* The letter stated that Lass Associates' proposal was "entirely out of the question. The mortgage is obviously worth considerably more than the demand note." App., Ex. T. Mr. Harris testified, however, that Berlowitz never responded to him about the letter, and that Harris did not send the letter to Lass Associates because Berlowitz had instructed him not to contact Lass Associates directly. App., Ex. B at 108.

In April 1999, plaintiffs also sued Berlowitz himself, for professional malpractice. App., Ex. A. In that action, plaintiffs alleged that when they complained to Berlowitz about Lass Associates' offer, Berlowitz "told them that he was in an awkward position because the principals of St. Paul Street Partners and Lass Associates were his close friends." App., Ex. A ¶ 23. They further alleged that "Attorney Berlowitz told the Harrises to ignore its (Lass Associates) offer," and that "Attorney Berlowitz did nothing [about the notice]. He did not write to Lass Associates and reject its offer." *Id.* ¶¶ 24, 25. Plaintiffs alleged that after their repeated attempts to contact Berlowitz about Ben Harris's proposed response, Berlowitz "eventually responded" and told plaintiffs "that they should not give Lass Associates a written objection." *Id.* ¶ 28.[2]

Berlowitz himself testified at his deposition in the instant action that he "was having daily conferences" with plaintiffs around the time when they received the § 9–505(2) notice, "so [he] would assume that [he] did have conferences with [plaintiffs] concerning [Ben Harris's] letter." App., Ex. F at 56. He testified that he explained plaintiffs' options to them, and that if plaintiffs rejected Lass Associates' proposal, Lass Associates could commence an action on the note against plaintiffs. He stated that plaintiffs were concerned that if Lass Associates obtained a judgment against them, Lass Associates would have a lien on other real property owned by plaintiffs. *Id.* at 56–58. Berlowitz testified that he explained to plaintiffs that if they accepted Lass Associates' proposal, Lass Associates would not be able to commence an action against them. *Id.* at 57–58. According to Berlowitz, it was plain-

---

**2.** The record does not reveal the result of the malpractice lawsuit. Berlowitz was later suspended by the Appellate Division for reasons unrelated to these events. *In re Berlowitz,* 281 A.D.2d 65, 723 N.Y.S.2d 778 (4th Dep't 2001).

tiffs' decision not to respond to Lass Associates' notice, after plaintiffs had been made aware of all their options. *Id.* at 58.

■ Whichever version of these events is true, the undisputed fact is that plaintiffs received Lass Associates' § 9–505(2) notice, and understood its meaning and the implications of not responding or objecting to it. For whatever reason, whether due to their attorney's inaction or their own decision, plaintiffs did not respond to the notice.

The important point is that, when the bank transferred the Key Bank Note to Lass Associates, it was not a foregone conclusion that Lass Associates would end up retaining the collateral, or that plaintiffs would lose their rights in the collateral. Nor was that conclusion inevitable when Lass Associates sent the notice to plaintiffs. When plaintiffs received the notice, they had options other than doing nothing. Under § 9–505(2), had plaintiffs objected within twenty-one days after the notice was sent, Lass Associates would have been required to dispose of the collateral under § 9–504. That section provides that a "secured party after default may sell, lease or otherwise dispose of any or all of the collateral in its then condition or following any commercially reasonable preparation or processing." It goes on to state the order in which the proceeds of disposition must be applied (*e.g.* to the secured party's expenses, the satisfaction of the secured indebtedness, etc.), and that "[i]f the security interest secures an indebtedness, the secured party must account to the debtor for any surplus, and, unless otherwise agreed, the debtor is lia-

ble for any deficiency." N.Y. U.C.C. § 9–504(2).

Plaintiffs, then, had the option of timely objecting to Lass Associates' proposal to effect a strict foreclosure, and by doing so, they could have prevented Lass Associates from simply retaining the collateral in satisfaction of plaintiffs' debt. Had an objection been lodged, there could have been a substantial surplus, had the Lass Associates sold the St. Paul note in a commercially reasonable manner. But, whether a surplus or a deficiency could have resulted has no bearing on the ultimate issue here, *i.e.*, whether the bank somehow impaired the collateral by transferring it to Lass Associates.

The fundamental problem with plaintiffs' claim is that when Lass Associates sent plaintiffs the § 9–505(2) notice, plaintiffs stood in no different position than if the bank had kept the note, and had sent plaintiffs a § 9–505(2) notice itself. Certainly, there could be no claim that the bank would have somehow violated its duties under the U.C.C. by acting in that fashion, when the U.C.C. itself expressly permits the secured party in possession to take such action.

■ Similarly, Key Bank could have sold the Key Bank Note to *any* third party, not just to Lass Associates, and that third party could then have proposed to retain the collateral in the same manner that Lass Associates did. Plaintiffs do not appear to contend, nor is there any authority, that *any* sale of the Key Bank Note to anyone would have constituted a violation of the bank's duties, either under the U.C.C. or the common law.[3] Under New

---

**3.** As noted in my prior decision in this case, the bank's common-law duties with regard to the collateral are largely coextensive with its duties under the U.C.C. *See Harris,* 89 F.Supp.2d at 415 ("defendant's duty to handle the collateral in a manner that does not destroy or impair its value does exist both at common law and under the U.C.C., and the principles concerning that duty are indeed largely, if not entirely, the same under both") (citing *In Matter of Bud–Lee Ski Centers, Inc. v. State,* 116 A.D.2d 715, 716, 497 N.Y.S.2d 768 (2d Dep't 1986)).

York law, a party's rights under a contract are generally considered to be freely assignable, unless the contract provides otherwise. *See Pravin Banker Associates, Ltd. v. Banco Popular del Peru,* 895 F.Supp. 660, 668 (S.D.N.Y.1995) (citing *Sullivan v. Int'l Fidelity Ins. Co.,* 96 A.D.2d 555, 465 N.Y.S.2d 235 (2d Dep't 1983)), *aff'd,* 109 F.3d 850 (2d Cir.1997). Here, the document by which plaintiffs assigned the St. Paul Street Note and mortgage to Key Bank implicitly provided that the bank could assign the note and mortgage to a third party, since it stated that plaintiffs assigned the note and mortgage "unto the assignee [*i.e.,* Key Bank], and to the successors, legal representatives and assigns of the assignee forever." Affidavit of Gary Wernz (Docket Item 6), Ex. A.

Just as the bank itself, had it not sold the Key Bank Note, could have proposed to retain the collateral on default, so could any buyer or assignee of the Key Bank Note have done so. That the assignee happened to be Lass Associates and not some other party did not affect plaintiffs' rights and obligations in the event that the assignee gave plaintiffs notice under § 9–505(2).

Regardless of who held the note, then, the holder had the right to give notice of its proposal to retain the collateral in satisfaction of the debt under § 9–505(2). At that point, plaintiffs had two options: object within twenty-one days, or remain silent, which is what they did. If they chose the former route, then the secured party, regardless of whether it was Lass Associates, Key Bank, or someone else, would have been obligated to dispose of the collateral in a commercially reasonable manner under § 9–504 with the surplus, if any, going to plaintiffs. If plaintiffs remained silent, and failed to timely redeem the collateral, *see* U.C.C. § 9–506, then the secured party could have simply retained the collateral, and plaintiffs' rights as well as their obligations relating to the debt or collateral would have been extinguished.[4]

■ I also note that the U.C.C., by its own terms, is to be "liberally construed and applied to promote its underlying policies and purposes." N.Y. U.C.C. § 1–102(1). One of those purposes is to "encourag[e] and facilitat[e] commercial transactions by allowing parties to freely contract under uniform laws." *Wegner v. Grunewaldt,* 821 F.2d 1317, 1321 (8th Cir. 1987) (rejecting proposed construction of U.C.C. that "would impair the transferability of secured property") (citing U.C.C. § 1–102(2)). It would hardly be consonant with the policies and purposes of the U.C.C. for a court to create, and impose upon parties to a contract, duties that are not spelled out or implied in either the

---

4. I note also that in the event of such a "strict foreclosure," it appears that plaintiffs would have had no right to any "surplus" from whatever disposition of the collateral the secured party chose to make, since, upon completion of the foreclosure, the secured party would have become the absolute owner of the collateral; in fact, the secured party in that scenario would have no obligation to "dispose" of the collateral at all. *See Warnaco, Inc. v. Farkas,* 872 F.2d 539, 544 (2d Cir. 1989) ("If the secured party holds the collateral without either making a commercially reasonable sale *or notifying the debtor of his intention to accept it in satisfaction of the*

*debt,* the debtor may move the court under Section 9–507 for an order that the secured party make some disposition of the collateral") (emphasis added); *Gilligan v. Briar Hill Lanes, Inc.,* 250 A.D.2d 809, 673 N.Y.S.2d 711 (2d Dep't 1998) (defaulting borrower remained legal owner of corporate stock he had pledged as collateral for loan, and thus was entitled to surplus which remained after satisfaction of the debt when the corporate assets were sold and the corporation was dissolved, where lender did not give written notice of an election to retain collateral in satisfaction of the debt as required by § 9–505(2)).

U.C.C. or in the contract itself. That is particularly so in view of the nature of the duty advanced by plaintiffs—essentially, that a secured party's freedom to assign its rights is circumscribed by a duty to inquire into the prospective assignee's motives and intentions. Such a duty exists nowhere in the U.C.C., and it could seriously hamper, rather than facilitate, parties' ability to freely assign rights obtained by contract.

It is true that plaintiffs' expert, Thomas A. Myers, opines in his affidavits that the bank breached its duty to preserve and protect plaintiffs' collateral by selling the Key Bank Note to Lass Associates without informing plaintiffs in advance. Expert opinion, however, is insufficient to create an issue of fact if it "is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable . . . ." *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1436 (9th Cir.) (quotation omitted), *cert. denied*, 516 U.S. 987, 116 S.Ct. 515, 133 L.Ed.2d 424 (1995). Therefore, "an admissible expert report may not be sufficient to preclude summary judgment where it offers nothing but naked conclusions." *Vollmert v. Wisconsin Dep't of Transp.*, 197 F.3d 293, 298 (7th Cir.1999).

To the extent that Myers's affidavit contains his opinions or beliefs about the bank's *legal* duty toward plaintiffs, it is entitled to no weight whatsoever. "As a general rule, the admissibility of evidence on a motion for summary judgment is subject to the same rules that govern the admissibility of evidence at trial." *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 175–76 (5th Cir.1990), *cert. denied*, 510 U.S. 859, 114 S.Ct. 171, 126 L.Ed.2d 131 (1993); *Darby v. System Transport, Inc.*, 99–CV–0075, 2001 WL 1188171 (W.D.N.Y. Oct.3, 2001) ("a court can only consider the affidavit of an expert witness on a motion for summary judgment if that expert's testimony would be admissible at trial") (citing *B.F. Goodrich v. Betkoski*, 99 F.3d 505, 525–27 (2d Cir. 1996), *cert. denied*, 524 U.S. 926, 118 S.Ct. 2318, 141 L.Ed.2d 694 (1998)).

Under the rules governing the admission of expert testimony at trial, "expert testimony on . . . purely legal issues is rarely admissible." *Nieves–Villanueva v. Soto–Rivera*, 133 F.3d 92, 99 (1st Cir.1997) (adding that "[a]t least seven circuit courts have held that the Federal Rules of Evidence prohibit such testimony, and we now join them as to the general rule"). Myers's opinion that the bank owed plaintiffs a fiduciary duty and that it breached that duty are thus not only contrary to the law, but inadmissible in any event. *See Miller v. American Nat. Bank and Trust Co. of Chicago*, No. 88 C 10909, 1992 WL 168813 (N.D.Ill. July 10, 1992) (affidavit of attorney offered by plaintiff, stating that defendant bank had duty to manage plaintiff's account and breached that duty, was not competent expert testimony, but merely legal opinion on ultimate issues of law; "the law is well settled that the issue of the existence of a legal duty and the application of laws to the parties is a matter for the trial judge"), *aff'd*, 4 F.3d 518 (7th Cir.1993).

While Myers may be of the opinion that Key Bank should not have acted as it did, I find that his opinion, to the extent that it suggests that Key Bank had a duty *under the law* to act otherwise, is without support in the law, and therefore fails to create a genuine issue of material fact. In his most recent affidavit, Myers opines that by selling the Key Bank Note to Lass Associates, the bank acted in its own best interests, whereas it was obligated as a fiduciary to act in the best interest of plaintiffs. The bank's legal obligations as a secured party, however, are set forth in U.C.C. § 9–207,

which for the reasons set forth above, I find the bank did not violate.

The bank's relationship with plaintiffs was a creditor-debtor one, and not principally a fiduciary relationship. But, even assuming that the bank had some other fiduciary obligations toward plaintiffs beyond those prescribed in the U.C.C., it would be absurd to think that Key Bank could never take its own interests into account, or that plaintiffs' interests had to be absolutely paramount at all times and in all situations. Obviously it would have been in *plaintiffs'* best interests for Key Bank simply to have forgiven their debt altogether, but the law imposes no duty on a creditor to do so. Rather, "at common law, and implicitly under the Uniform Commercial Code, a creditor may assign its rights and transfer possession of collateral without the knowledge or consent of the debtor, as long as the debtor's right to redeem upon payment of the debt is not impaired." *Chittenden Trust Co. v. Marshall,* 146 Vt. 543, 547, 507 A.2d 965 (1986). That is precisely what the bank did here. Plaintiffs retained the same right to redeem after the bank's transfer to Lass Associates that they would have had the bank itself, or any other transferee, exercised its rights under § 9–505. Plaintiffs' failure to object to Lass Associates' notice, whether the result of their own informed decision or their attorney's negligence or questionable advice, is what caused plaintiffs to lose the value of the collateral, and that failure to act is not Key Bank's fault.

For these reasons, then, I find that all of plaintiffs' remaining claims must be dismissed. As stated, Key Bank's duties under the U.C.C. and under common law are essentially one and the same: not to impair or destroy the collateral or plaintiffs' right to redeem. Key Bank did not violate that duty.

Plaintiffs' cause of action for breach of the covenant of good faith and fair dealing must also be dismissed. "This covenant is breached when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement." *Aventine Inv. Management, Inc. v. Canadian Imperial Bank of Commerce,* 265 A.D.2d 513, 514, 697 N.Y.S.2d 128 (2d Dep't 1999). As explained above, however, nothing that the bank did deprived plaintiffs of their contractual rights; it was plaintiffs' own failure to respond to Lass Associates' notice that precipitated the result here.

In addition, while an obligation of good faith and fair dealing is implied in every contract under New York law, that duty, "however, is not without limits, and no obligation can be implied that 'would be inconsistent with other terms of the contractual relationship.'" *Dalton v. Educational Testing Service,* 87 N.Y.2d 384, 389, 639 N.Y.S.2d 977, 663 N.E.2d 289 (1995) (quoting *Murphy v. American Home Products,* 58 N.Y.2d 293, 304, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983)). *See also Marine Midland Bank, N.A. v. Yoruk,* 242 A.D.2d 932, 933, 662 N.Y.S.2d 957 (4th Dep't 1997) ("it is well settled that an obligation may not be implied that 'would be inconsistent with other terms of the contractual relationship'") (quoting *Sabetay v. Sterling Drug,* 69 N.Y.2d 329, 335, 514 N.Y.S.2d 209, 506 N.E.2d 919 (1987)).

As stated, the assignment by plaintiffs to the bank of the St. Paul Street Note and mortgage implicitly contemplated that the collateral could be held not just by Key Bank, but by its "successors, legal representatives and *assigns* ...." Wernz Aff. Ex. A. In addition, the U.C.C. expressly permitted the bank to assign its security interest to a third party, and if the parties had wanted to limit the bank's rights in that regard, they could have writ-

**718**

ten their contract in such a way as to do so. *See* U.C.C. § 1–102(3) (stating that "[t]he effect of provisions of this Act may be varied by agreement," and that although "the obligations of good faith, diligence, reasonableness and care prescribed by this Act may not be disclaimed by agreement ... the parties may by agreement determine the standards by which the performance of such obligations is to be measured if such standards are not manifestly unreasonable"). Since they did not do so, and since the bank's actions were consistent both with its obligations under the U.C.C. and with the parties' contract, there was no violation of the duty of good faith and fair dealing. *See Reale v. Sotheby's, Inc.,* 278 A.D.2d 119, 121, 718 N.Y.S.2d 37 (1st Dep't 2000) (since date on which auction of plaintiff's coin collection was conducted was one of two possible dates expressly set by parties' consignment agreement, plaintiff's cause of action for breach of the implied covenant of good faith and fair dealing, based on defendant's scheduling of auction on same date as another auction house's coin auction, was properly dismissed), *leave to appeal denied,* 96 N.Y.2d 706, 725 N.Y.S.2d 278, 748 N.E.2d 1074 (2001).

## II. The Partners' Motion for Summary Judgment

At oral argument on the pending motions, counsel for the bank stated that the bank was withdrawing its claims against the partners for rescission and unjust enrichment, so the only remaining claim is that for contribution and indemnity. Since that claim is predicated upon a finding of liability on the part of the bank, my decision granting summary judgment in favor of the bank on all of plaintiffs' claims renders the bank's claim for contribution and indemnity moot. Accordingly, I grant the partners' motion for summary judgment.

## CONCLUSION

The motion for summary judgment filed by defendant Key Bank National Association, d/b/a Key Bank, Key Bank of New York, and Key Bank of Central New York (Docket Item 42) is granted, and the complaint is dismissed. The motion for summary judgment filed by third-party defendants 1564 St. Paul Street Partners, Lass Associates a/k/a "Last Associates," Sanford Liebschutz, Edward J. After, Martin L. Schuster, Jack Schuster and Bell Schuster (Docket Item 36) is granted, and the third-party complaint is dismissed.

IT IS SO ORDERED.