**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 04a0044n.06**
**Filed: October 28, 2004**

**Nos. 03-6071; 03-6091; 03-6092**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| PAUL RICE, as Trustee for Pagan Lewis Motors, Inc., Trust, PAGAN LEWIS MOTORS, INC., JACK PAGAN, ALLAN PAGAN, and PAUL F. RICE. | ) ) ) ) | |
| | ) | |
| Plaintiffs-Appellees/ Cross-Appellants, | ) ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| v. | ) | WESTERN DISTRICT OF TENNESSEE |
| | ) | |
| LIBERTY SURPLUS INSURANCE CORPORATION and FEDERAL INSURANCE COMPANY, | ) ) ) | |
| | ) | |
| Defendants-Appellants/ Cross-Appellees. | ) ) | |

Before: GUY and SUTTON, Circuit Judges; CARR, District Judge.[*]

SUTTON, Circuit Judge. Liberty Surplus Insurance Corporation and Federal Insurance Company challenge the district court's summary-judgment ruling in favor of Pagan Lewis Motors, Allan Pagan, Jack Pagan and Paul Rice (collectively "PLM"). According to the district court, director and officer liability policies issued by Liberty and Federal make the two companies liable to PLM for a damages award that PLM secured against Liberty's and Federal's insured. According to Liberty and Federal, several provisions of the insurance policies at issue bar coverage. Agreeing

---

[*] The Honorable James G. Carr, United States District Judge for the Northern District of Ohio, sitting by designation.

with Liberty and Federal that the fraud exemption in each policy bars coverage, we reverse the district court's grant of summary judgment and order the court to enter summary judgment in favor of Liberty and Federal.

I.

In May 1999, Merchantonline.com ("MOL") and PLM entered into an agreement by which MOL would sponsor the Pagan Racing Team, an Indianapolis car racing team owned by PLM. Under the agreement, MOL promised over time to pay $1.53 million to PLM for promotional rights, including the right to place MOL's logo on PLM's cars during races. At the time, Tarek Kirschen served as CEO of MOL and Michael Karsch served as MOL's in-house general counsel. Jack and Allan Pagan, father and son, owned PLM, and Paul Rice was a party to the agreement as Trustee for PLM.

It did not take long for a dispute to arise. In June 1999, MOL failed to make a periodic payment under the agreement, after which PLM gave MOL notice that it had breached the agreement.

On September 8, 1999, PLM and MOL reached a workout agreement to settle the matter. Under the new agreement, MOL rescheduled its payments and pledged a total of 500,000 shares of restricted MOL stock to Jack Pagan, Allan Pagan and Paul Rice. The agreement allowed MOL to retain, for twelve months, the right to repurchase the shares at $3 per share. Under the agreement,

Kirschen also placed 500,000 shares of his own MOL stock in escrow as security for MOL's obligation to pay the $1.53 million.

On September 22, 1999, MOL breached the workout agreement when its monthly installment check bounced. In response, PLM declared the workout agreement in default and, in accordance with its terms, accelerated payment of all sums due. While MOL did not comply with this demand, it did continue to make, and PLM continued to accept, monthly payments. When the MOL check bounced, PLM also informed MOL that it was in breach of the entire agreement—meaning that the Pagans and Rice believed that MOL's buyback option on the 500,000 shares issued to them was no longer good. MOL, on the other hand, maintained that it retained the buyback option so long as the money due had been paid in full by the end of the twelve-month period.

Through the fall of 1999, the parties continued to dispute MOL's obligations. On November 4, 1999, Allan Pagan sent Kirschen an e-mail calling him a "common thief" and "liar" and indicating that he had given his attorney in Texas "the go ahead to instigate all legal action possible here and in Florida" and that he was "instructing [Rice] to do the same from Tennessee." JA 402. In early 2000, when MOL's stock price began rising, matters became still more contentious. Rice sent Kirschen an e-mail on February 4, 2000, asking him to confirm that Rice and the Pagans would be able to realize the full value of their stock when the one-year holding period expired. Kirschen never did so, and the parties never reached an agreement on the stock issue.

While this dispute continued to fester, Kirschen applied for Directors and Officers ("D&O") liability insurance with Liberty (for a primary policy) and with Federal (for an excess policy). In the application for primary D&O liability coverage with Liberty, question number six asks: "Does anyone for whom insurance is sought have any knowledge or information of any act, error, omission, fact or circumstance which may give rise to a Claim which may fall within the scope of the proposed insurance?" JA 359. Kirschen responded, "no." *Id.* "It is understood and agreed," the application then states, "that if anyone for whom this insurance is sought has any knowledge of any such act, error, omission, fact, or circumstance, any claim emanating therefrom shall be excluded from coverage under the proposed insurance." *Id.*

Liberty issued a primary policy to MOL for $300,000 from June 27, 2000, to June 27, 2001. Section 6.1 of the policy says that "[t]he Insureds represent that the statements and representations contained in the Application are true and shall be deemed material to the acceptance of the risk or the hazard assumed by the Insurer under this Policy. This Policy is issued in reliance upon the truth of such statements and representations." JA 126 (emphasis removed). Section 6.2 adds: "The Insureds agree that if the Application contains any statements or representations that are untrue, this Policy shall be void as to: (a) any Insured Person who knew the facts that were not truthfully disclosed." JA 126 (emphasis removed).

The policy contains the following relevant exclusions. Section 5.5, referred to by the parties as the "Prior Demand Exclusion," bars coverage for claims "based upon, arising from, or in any way related to: (a) any demand, suit, or other proceeding against any Insured which has been made,

which existed, or was pending prior to [June 27, 2000,] or (b) the same or substantially the same facts, circumstances or allegations involved in such demand, suit, or other proceeding." JA 125 (emphasis removed). Section 5.10, referred to by the parties as the "Dishonesty Exclusion," precludes coverage for claims "based upon, arising from, or in any way related to any deliberately dishonest, malicious or fraudulent act or omission or any willful violation of law by any Insured if a judgment or other final adjudication adverse to the Insured establishes such an act, omission or willful violation." JA 126 (emphasis removed). Endorsement number Six to the Liberty policy, referred to by the parties as the "Prior Act Exclusion," states that the insurer is not liable for any loss in connection with any claim "for, based upon, arising from, or in any way related to any Wrongful Act taking place in whole or in part prior to June 27, 2000. This policy shall also exclude coverage for Loss arising from any Wrongful Act taking place on or after such date, if such Wrongful Act when taken together with such prior Wrongful Act constitute Interrelated Wrongful Acts." JA 141 (emphasis removed). "Wrongful Act" means "any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty, committed or attempted by the Insured Persons in their capacities." JA 133 (emphasis removed).

In completing Federal's application for excess D&O coverage, Kirschen stated that he was not "aware of any facts or circumstances which he [had] reason to suppose might give rise to a future claim that would fall within the scope of the proposed coverage." JA 355. "It is agreed," the application adds, "that if such facts or circumstances exist, whether or not disclosed, any claim arising from them is excluded from this proposed coverage." *Id.*

Federal issued an excess policy to MOL directors and officers for the policy period June 27, 2000, to June 27, 2001, in the amount of $2,500,000, which by its terms provided coverage only after the underlying insurance (Liberty's policy) had been exhausted. The Federal policy also states that it applies in conformance with the terms, conditions and endorsements of the primary policy unless specifically noted in the Federal policy. For purposes of this appeal, all relevant Liberty policy provisions that bar coverage under the Liberty policy also by extension bar coverage under the Federal policy.

In March of 2000, MOL's stock split. On August 17, 2000, Bob Hausman of MOL emailed Rice to let him know that MOL had found a buyer willing to pay $1.5 million for the now one million shares that he and the Pagans held and asked where MOL should wire the money. Rice responded that "we entered the Workout Agreement which contained an option for MOL to buy back stock offered by [Kirschen] to keep PLM from suing and in effect destroying MOL; all MOL had to do was honor this second written agreement, but it failed to do so, and PLM suffered damages . . . . MOL has forfeited any option to buy the stock back." JA 416. Rice added that his email served as a request for MOL counsel to issue the Rule 144 letter so that he and the Pagans could begin selling their stock on their own. (Generally speaking, under SEC Rule 144, restricted stock may not be sold unless the issuing corporation files a letter with the SEC certifying that the shares have been held for more than one year and that the number of shares to be sold does not exceed one percent of the total shares outstanding. *See* 17 C.F.R. § 230.144.) MOL never issued the Rule 144

letter, and PLM was unable to sell the stock after the one-year holding period ended on September 8, 2000. During the fall of 2000, MOL's stock price declined rapidly.

On December 12, 2000, PLM filed a lawsuit against Kirschen, Karsch and MOL in the Western District of Tennessee. The complaint, as amended, alleged five counts against Kirschen. Three of the counts concerned breaches of contract, which the parties agree are not covered by the D&O insurance policies and which are not relevant here. The remaining counts—Count III (relating to the stock in escrow) and Count V (relating to the personal stock held by Rice and the Pagans)—alleged that Kirschen instructed MOL's general counsel to refuse to approve the Rule 144 letter and that such action amounted to "tortious interference with contract in violation of [Tennessee Code] § 47-50-109 and an unlawful conspiracy to defraud Plaintiffs" in violation of Tennessee Code § 39-14-116. JA 204. Section 47-50-109 of the Tennessee Code creates a cause of action against those who induce a breach of contract and declares such behavior "unlawful"; § 39-14-116 establishes a Class E felony when any person, "with intent to hinder enforcement of [a security] interest or lien, destroys, removes, conceals, encumbers, transfers, or otherwise harms or reduces the value of the property." Tenn. Code Ann. § 39-14-116.

The complaint also alleged that Karsch, Kirschen and MOL "acted in concert and as part of a civil conspiracy to defraud [PLM]." JA 200. "Their concerted, wrongful and illegal acts," it continued, "were designed to violate" § 39-14-116. *Id.*

The MOL defendants chose not to defend the suit against them, and on June 14, 2001, the district court entered a default judgment in favor of the PLM plaintiffs "as to all allegations and claims for relief" in the amended complaint and ordered a later hearing on damages. JA 302. MOL and Karsch successfully moved to set aside the default judgment as it pertained to them, but Kirschen failed to persuade the court to set aside the default judgment against him. On March 1, 2002, after a damages hearing, the district court entered a final judgment against Kirschen making him liable for more than $4.8 million in damages resulting from his failure to issue the Rule 144 letter.

On April 8, 2002, PLM filed a third-party-beneficiary claim against Liberty and Federal in federal district court in Tennessee, seeking to hold the two insurance companies liable under MOL's D&O policies for the judgment against Kirschen. On July 25, 2003, the district court granted summary judgment in favor of PLM, holding that Kirschen's failure to issue the Rule 144 letter was an act covered by the policies.

In reaching this conclusion, the district court noted that the final judgment says that, "As a direct and proximate result of the Defendant Kirschen's (and possibly other Defendants') failure to timely issue, or cause to be issued, the 'Rule 144' letter, Plaintiffs were unable to sell their stock after September 8, 2000, even though they were entitled to do so. Had they been allowed to do so, the Plaintiffs would have sold their stock as soon as possible after September 8, 2000." D. Ct. Op. at 5. Accepting that statement as the sole finding regarding liability, the district court held that it was the failure to issue the Rule 144 letter alone that caused PLM's damage:

> The Court is persuaded by Plaintiff's argument that "applying the 'but for' test, it is obvious that this Court has found, once and for all time, that, if the Rule 144 Letter had been issued as the insured was obligated to do, plaintiffs would have sold their stock and, therefore, would have suffered no damages as a result of the defendants' insured's wrongful act. (Pl. Reply Brief at 43, fn 4.)"

*Id*. at 10. In support, the district court relied on *Queen Insurance Co. of America v. Globe Rutgers Fire Insurance Co.*, 263 U.S. 487 (1924), *Allstate Insurance Co. v. Watts*, 811 S.W.2d 883 (Tenn. 1991), and *Planet Rock, Inc. v. Regis Insurance Co.*, 6 S.W.3d 484 (Tenn. Ct. App. 1999), for the proposition that, "in determining whether an event is within the coverage of an insurance policy, courts look at the immediate cause of the loss, rather than the underlying context." *Id*. at 10. By this way of analyzing causation, the district court determined that the failure to issue the Rule 144 letter was not a continuation of the dispute already underway when the policies were issued, but was a separate and independent breach of Kirschen's fiduciary duty to the plaintiffs as shareholders of MOL stock. "It is this independent fiduciary duty to act," said the district court, "or rather, this failure to act in accordance with this fiduciary duty, that caused the loss, not the fact that MOL and Plaintiffs had entered into contracts, had breached those contracts and had worked out an agreement that was again breached." *Id.* at 11–12.

The district court next held that the failure to issue the Rule 144 letter did not relate to any pre-policy demands made by PLM (triggering the Prior Demand Exclusion) or to any pre-policy wrongful acts (triggering the Prior Act Exclusion). Because this act was a separate tort, the district court added, Kirschen's failure to disclose the facts and circumstances surrounding the breaches of

contract and ongoing dispute at the time he applied for insurance did not preclude coverage under the "Warranty Provisions."

Finally, the district court determined that the Dishonesty Exclusion did not apply. "The final judgment entered by the court on March 1, 2002," it reasoned, "did not find that there was any such deliberately dishonest, malicious, or fraudulent act or omission. In accordance with the tenets of res judicata and collateral estoppel, the court declines to revisit allegations set forth in the Complaint of a case in which the court has already rendered a final judgment." *Id*. at 14. Based on these determinations, the district court denied Liberty and Federal's motions for summary judgment and granted summary judgment in favor of Rice and his co-plaintiffs. In response, the insurance companies filed this appeal regarding the court's summary-judgment ruling, which we review de novo. *Int'l Union, United Mine Workers of Am. v. Apogee Coal Co.*, 330 F.3d 740, 743 (6th Cir. 2003).

II.

Liberty and Federal challenge several aspects of the district court's decision. They argue that coverage is barred under the Prior Demand Exclusion, the Prior Act Exclusion, the Dishonesty Exclusion and the Warranty Provisions. Any one of these arguments, if accepted, would bar coverage in its entirety with respect to the primary and excess D&O insurance polices. Because we are persuaded that the Dishonesty Exclusion applies, we consider that argument and that argument alone.

Under the Dishonesty Exclusion contained in the Liberty policy (and contained by incorporation in the Federal excess-insurance policy), the insurers disclaimed responsibility for claims "based upon, arising from, or in any way related to any deliberately dishonest, malicious or fraudulent act or omission or any willful violation of law by any Insured if a judgment or other final adjudication adverse to the Insured establishes such an act, omission or willful violation." JA 126. The parties agree that Kirschen was an "insured" capable of committing a prohibited act and (through his actions) precluding any coverage under the policies. And there is no dispute that a pertinent "judgment or other final adjudication" was issued in the lawsuit between PLM and Kirschen.

The critical point of contention is whether the default judgment entered against Kirschen should be considered part of the "judgment or other final adjudication" for purposes of this policy exclusion. Liberty and Federal argue that the default judgment, which was issued on the question of Kirschen's liability, became part of the final judgment, which was issued after the hearing on damages. PLM counters that the final judgment does not say that Kirschen committed any "deliberately dishonest, malicious, or fraudulent act[,] omission" or any "willful violation of law," that the insurance companies are trying to re-write the final judgment and that the Dishonesty Exclusion accordingly does not apply. PLM takes the position, in other words, that the final judgment "supersedes the earlier general default judgment which was not final." PLM Br. at 47. In our view, PLM's reasoning gives too much credit to the language of the final judgment and too little credit to the legal consequences of the default judgment.

The two primary orders in the underlying action deal with different elements of PLM's cause of action, the first addressing liability, the second addressing damages. The final judgment entered on March 1, 2002, built upon and incorporated the liability ruling, but it by no means superseded the default judgment. The default judgment order against Kirschen by its terms dealt only with liability and specifically reserved the issue of damages for a later hearing. Because the court decided to address the issues in the case in a bifurcated manner and because its initial ruling resolved the liability issues, it should come as no surprise that the final order in the case addressed just damages and does not make any findings regarding liability—except to say that Kirschen's action caused the damages, then to proceed to determine the amount of damages.

Under these circumstances, the court did not make any findings regarding the impact of the default judgment on liability—except to say that Kirschen was liable—because it had no reason to do so. The impact of a default judgment arises by operation of law, and that operation takes effect whether the district court chooses to acknowledge it or not. Once a court enters default judgment, it becomes "conclusive by way of estoppel in respect to all such matters and facts as are well pleaded and properly raised." *Lawhorn v. Wellford*, 168 S.W.2d 790, 792 (Tenn. 1943); *See also Riehle v. Margolies*, 279 U.S. 218, 225 (1929) ("A judgment of a court having jurisdiction of the parties and of the subject-matter operates as res judicata, in the absence of fraud or collusion, even if obtained upon a default."); *In re Bursack*, 65 F.3d 51, 54 (6th Cir. 1995).

Final judgments, moreover, sweep up all prior orders entered in a case and make them part of the final judgment eligible for appeal. *See* Charles Alan Wright & Arthur R. Miller, Federal

Practice and Procedure § 3905.1 (recognizing that "[t]he variety of orders open to review on subsequent appeal from a final judgment is enormous" and includes "orders with respect to default"); *Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 220 (5th Cir. 2000) ("[T]he general rule is that appeal from final judgment opens the record and permits review of all rulings that led up to the judgment.") (internal quotation omitted); *Pacitti v. Macy's*, 193 F.3d 766, 777 (3d Cir. 1999) ("[A] notice of appeal that names the final judgment is sufficient to support review of all earlier orders that merge in the final judgment.") (quoting Wright & Miller, Federal Practice and Procedure § 3949.4); *Coleman v. Am. Red Cross*, 23 F.3d 1091, 1096 (6th Cir. 1993) ("The law is well settled that an appeal from a final judgment draws into question all prior non-final rulings and orders."). These prior orders need not await final comment or some other blessing by the district court judge to become part of the final judgment; they become part of the final judgment (again) by operation of law. When the district court entered final judgment as to *all* of PLM's claims against Kirschen, then, the default-judgment order on liability became part of the final judgment in no less a manner than if the district court had expressly incorporated the order.

Finally, the default judgment amounts to "a judicial or conclusive admission which may be avoided only by setting aside the default." *Howell v. Perry*, No. 86-80-II, 1986 WL 6316 at *2 (Tenn. Ct. App. June 6, 1986). This court has recognized that "where a court has entered judgment on a default, [Federal] Rule [of Civil Procedure] 55 states that a court may set aside that judgment only in accordance with the grounds laid out in [Federal] Rule [of Civil Procedure] 60(b)." *Thompson v. Am. Home Assurance Co.*, 95 F.3d 429, 432 (6th Cir. 1996). That did not happen here.

- 13 -

Kirschen, to be sure, tried to set aside the default judgment. But PLM opposed the motion, and the court denied it, meaning that the default judgment remains conclusive as to Kirschen's liability.

In a variation on this theme, PLM suggests that the insurance companies are ignoring res judicata principles and attempting to relitigate issues contained in the "final judgment." But the critical premise of this argument is that the final judgment somehow changed the default-judgment order. Since the final judgment did no such thing, the argument is mistaken. In the end, PLM made allegations of fraud, civil conspiracy and willful violation of a criminal statute against Kirschen and obtained a default judgment in their favor as to every allegation. They have offered no theory by which we may ignore this judgment, and its effects, in a later suit concerning many of these same factual issues.

Having concluded that the default judgment is conclusive as to Kirschen's liability, we consider whether it establishes that Kirschen committed any "deliberately dishonest, malicious or fraudulent act or omission or any willful violation of law." When a court enters a default judgment against a defendant, the defendant "impliedly confesses all of the material allegations of fact contained in his complaint, except the amount of the plaintiff's unliquidated damages." *Patterson v. Rockwell Int'l*, 665 S.W.2d 96, 101 (Tenn. 1984). In this instance, the court entered a default judgment against Kirschen "as to all allegations and claims for relief" in PLM's amended complaint. JA 301. The amended complaint contains five counts involving Kirschen, three of which need not detain us because they relate to breaches of contract, which (the parties agree) are not covered by the policies. The two remaining counts allege that Kirschen instructed Karsch to refuse to issue the

Rule 144 letter, which "amounts to tortious interference with contract in violation of [Tennessee Code] § 47-50-109, and an unlawful conspiracy to defraud Plaintiffs . . . causing a violation of [Tennessee Code] § 39-14-116." JA 204–05. The complaint further alleges that Kirschen "acted in concert [with Karsch and MOL] and as part of a civil conspiracy to defraud [PLM]" and that his "concerted, wrongful, and illegal acts were designed to violate [ ] § 39-14-116." JA 200. Because the subsequently entered default judgment means that Kirschen has "impliedly confesse[d] all of the material allegations of fact" contained in the complaint, *Patterson*, 665 S.W.2d at 101, Kirschen has confessed that he tortiously interfered with a contract in violation of Tennessee law, that he was involved in a "civil conspiracy to defraud" PLM in violation of § 39-14-116 (a felony) and that his "illegal acts [were] designed to violate" § 39-14-116. JA 200.

The final judgment, then, makes Kirschen's instruction to Karsch not to issue the Rule 144 letter a violation of two Tennessee laws. Because the complaint states that Kirschen's actions were "designed to violate" Tennessee Code § 39-14-116 and that his violation was part of a conspiracy to violate the law, there can be no question that the violation was willful. Add to this the fact that the allegations in the complaint state that Kirschen instructed Karsch to refuse to issue the letter in "bad faith," that Kirschen committed "illegal acts" and that he intended to "defraud" plaintiffs, and it becomes clear that the default judgment establishes that Kirschen's actions were deliberate and willful. Rice's claim against Liberty and Federal accordingly is a claim "based on, arising out of, or in any way related to a deliberately dishonest, malicious or fraudulent act or omission or any willful violation of law" and is not covered by the policy.

For these reasons, we reverse the judgment of the district court and order the court to enter summary judgment in favor of Liberty and Federal.