RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 05a0010p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

R. GEOFF LAYNE; CHARLES E. JOHNSON, JR.,
  *Plaintiffs-Appellants,*

v.

BANK ONE, KENTUCKY, N.A.; BANC ONE
SECURITIES CORPORATION,
  *Defendants-Appellees.*

No. 03-6062

---

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
Nos. 01-00269; 01-00368—Jennifer B. Coffman, District Judge.

Argued: December 6, 2004

Decided and Filed: January 10, 2005

Before: MARTIN and MOORE, Circuit Judges, BELL, Chief District Judge.[*]

---

## COUNSEL

**ARGUED:** Mason L. Miller, GETTY & MAYO, Lexington, Kentucky, for Appellant. Dustin E. Meek, TACHAU, MADDOX, HOVIOUS & DICKENS, Louisville, Kentucky, for Appellees. **ON BRIEF:** Mason L. Miller, Richard A. Getty, GETTY & MAYO, Lexington, Kentucky, for Appellant. Dustin E. Meek, Mary E. Eade, TACHAU, MADDOX, HOVIOUS & DICKENS, Louisville, Kentucky, Leonard A. Gail, BANK ONE, Chicago, Illinois, for Appellees.

---

## OPINION

---

KAREN NELSON MOORE, Circuit Judge. Plaintiff-Appellant, Charles E. Johnson, Jr. ("Johnson"), appeals the district court's grant of summary judgment in favor of Defendants-Appellees, Bank One, Kentucky, N.A. and Banc One Securities Corporation (collectively, "Bank One"). The district court found that under Kentucky law, Bank One was not liable for the depreciation in value of the shares it held as collateral for a loan to Johnson. Furthermore, the district court found that by selling the stock on a national stock exchange, Bank One acted in a commercially reasonable way in disposing of the collateral. On appeal, Johnson asserts that the

---

[*] The Honorable Robert Holmes Bell, Chief United States District Judge for the Western District of Michigan, sitting by designation.

district court erred in these findings, as well as by granting Bank One summary judgment on his breach of fiduciary duty and breach of contract claims. Johnson also argues that summary judgment is inappropriate with regards to Bank One's counterclaims against him. We conclude that the district court did not err on any of these issues, and thus, the grant of summary judgment to the defendants is **AFFIRMED**.

## I. BACKGROUND

This case arises out of two loan transactions made by Bank One to plaintiffs Johnson and Geoff Layne ("Layne").[1] Johnson was the founder and CEO of PurchasePro.com, Inc. ("PurchasePro"); Layne served as the national marketing director of the company. Following a successful initial public offering, both Johnson and Layne had considerable net worth, though their PurchasePro shares were subject to securities laws restricting their sale.[2] To increase their liquidity, Johnson and Layne entered into separate loan agreements with Bank One for an approximately $2.8 million and $3.25 million line of credit respectively, secured by their shares of PurchasePro stock.[3] The loan agreements included a Loan-to-Value ("LTV") ratio, which conditioned default on the market value of the collateral stock. The LTV ratio was calculated as the outstanding balance on the line of credit over the market value of the collateral stock. Specifically, Layne's loan agreement had a 50% LTV ratio, which meant that the market value of the collateral stock must be at least twice the outstanding balance on the line; Johnson's loan agreement had a 40% LTV ratio, which meant that the market value must remain two and a half times the outstanding balance.[4] The credit agreements provided that if the LTV ratio exceeded those specified percentages, Johnson and Layne had five days to notify Bank One and either increase the collateral or reduce the outstanding balance such that the target LTV ratios were met. Failure to remedy the situation would be an immediate default and Bank One "*may exercise* any and all rights and remedies" including, "*at Lender's discretion,*" selling the shares. Joint Appendix ("J.A.") at 353-54 (Comm. Pledge & Sec. Agmt.) (emphasis added). If Bank One intended to sell the shares, it had to give Johnson written notice ten days prior to the sale. Pursuant to these agreements, Johnson and Layne entered into trade authorization agreements that enabled Bank One to sell the shares without their consent. Though Bank One had the option of selling the collateral shares if the LTV ratios were not met, nothing in the loan agreements obligated it to do so.

---

[1] On March 29, 2004, Bank One and Layne entered into a settlement agreement of all of their claims. As a result, Layne agreed to voluntarily dismiss his appeal pursuant to Fed. R. App. P. 42(b). Johnson's appeal remains before us for determination.

[2] Johnson and Layne were considered "affiliates" of PurchasePro as defined under SEC Rule 144 and therefore, their shares in the company were restricted. 17 C.F.R. § 230.144. Pursuant to Rule 144, an affiliate may not sell restricted securities unless certain conditions are met, including a minimum holding period, a limitation on the amount to be sold, and the manner of the sale. 17 C.F.R. § 230.144(d)-(f).

[3] It is unclear from the record if other assets were offered or accepted to secure the loans. With regards to their PurchasePro shares, Layne pledged 482,142 shares to secure his $3.25 million credit line, while Johnson pledged 410,000 shares for his $2.8 million credit line.

[4] For example, if Johnson utilized the entire line of credit, approximately $2.8 million, the market value of his collateral stock would need to be approximately $6.9 million to comply with the required LTV ratio of 40%.

In February 2001, along with the rest of the Internet sector, the stock price of PurchasePro fell considerably, such that both loans exceeded their respective LTV ratios.[5] Rather than selling the collateral stock, Bank One entered into discussions with Johnson and Layne to pledge more collateral. The record reveals that Layne and Johnson repeatedly stated their intentions to pledge additional collateral to meet the LTV requirements. On March 6, 2001, Layne wrote that he had "been able to hold [Bank One] off from calling it in because of additional collateral that I have pledged." J.A. at 355 (Email from Layne to Lichtenberger). On March 19, 2001, Johnson sent an email to Layne inquiring about whether Bank One was "hanging in there." J.A. at 517 (Email from Johnson to Layne). On March 22, 2001, Bank One sent a letter to Layne informing him that the loan was in default. J.A. at 362 (Letter from Holton to Layne). That same day, in a conversation with Bank One, Layne stated that "[you] guys have been great . . . holding on for this long," but he indicated he would like to begin selling some of the collateral stock. J.A. at 357 (Tr. of call between Layne and Thompson). After this conversation, Bank One began taking steps to liquidate the collateral stock for both loans. Later that same day, however, Johnson sent an email to Layne under the subject heading "Bank 1" which stated "they want to sell our shares and I want to stop it with additional collateral-pls call." J.A. at 364 (Email from Johnson to Layne). Later that night, Layne sent an email to Burr Holton ("Holton"), Bank One's loan officer, under the heading "[h]old off on selling" which stated that "[Johnson] is putting together a collateral package (real estate, additional shares, etc.) to secure the note at acceptable levels." J.A. at 366 (Email from Layne to Holton). Early the next morning, Layne left a voicemail for Doug Thompson, Bank One's senior trader, stating "[i]t's a possibility that . . . [Johnson]'s gonna put up some additional securities to secure his note and my note and maybe we don't sell right now. So I just wanna put a hold on any . . . trading activity until [Johnson] talks with [the loan officer]." J.A. at 365 (Voice Message from Layne to Thompson). On April 3, 2001, Layne called Holton and stated that "he was ready to sell his [collateral] stock as soon as possible" and that "he has decided not [to work] with Mr. Johnson on combining their loans and adding additional collateral, which would have cured their default." J.A. at 367 (Memo. from Holton to File). The next day, April 4, 2001, Layne faxed a letter to Holton which stated that he would not be able to provide additional collateral to satisfy the loan agreement. J.A. at 491 (Letter from Layne to Holton); 634 (Layne Dep.). The following day, however, Layne changed his mind again and faxed Holton a letter which stated:

> [Johnson] and myself are putting together a collateral package to secure our notes with Bank One. I DO NOT wish for the bank to proceed with any liquidation whatsoever of my PurchasePro stock at this time. I believe we have a strong company and that market conditions will improve, thus enabling the stock to recover to a price that allows me to pay my debt to Bank One in it's [sic] entirety. And that is certainly in everybody's best interest.

J.A. at 371 (Letter from Layne to Holton). The same day, Layne sent an email to Holton which stated "[Johnson] will be back this afternoon and we will firm the plan then. I would like to have time to discuss this [sic] him before we start liquidation." J.A. at 369 (Email from Layne to Holton). The record reveals that Johnson and Bank One were involved in discussions in the end of April and May to pay down the balance or pledge additional collateral including his house in Las Vegas. At the end of May, the proposed deal fell through and Bank One sent letters to Johnson notifying him of his continued default on the loans. Throughout the entire time from February to May 2001, Layne and Johnson continued to make principal and interest payments under the terms of the agreement, but both loans significantly exceeded their respective LTV ratios. Bank One finally sold Johnson's

---

[5]Because the loans were over-collateralized, though the market value of the stock was below the required LTV level, it was still greater than the outstanding loan balances. Thus, Bank One could have sold the stock in February, recouped the value of the loans, and returned the surplus proceeds to Layne and Johnson.

PurchasePro shares over four days in July, recovering $524,757.39 in net proceeds to pay down his debt, leaving approximately a $2.2 million unpaid balance.[6]

Layne and Johnson separately filed suit against Bank One in the United States District Court for the Eastern District of Kentucky on a number of counts. On January 30, 2002, the cases were consolidated. Bank One filed counterclaims against Johnson and Layne, seeking payment for the deficiencies on the loans. On November 1, 2002, Bank One filed a motion for summary judgment on all counts as well as its counterclaims. On March 26, 2003, the district court granted Bank One's motion. Johnson appeals from that ruling.

## II. ANALYSIS

### A. Standard of Review

We review "the grant of summary judgment de novo, viewing all evidence in the light most favorable to the nonmoving party." *Boone v. Spurgess*, 385 F.3d 923, 927 (6th Cir. 2004). "Under Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).

### B. Duty to Preserve Collateral

We first consider Johnson's argument that Bank One violated a duty under Kentucky law to preserve the value of the collateral held in its possession. With respect to the regulation of secured transactions, Kentucky has adopted the Uniform Commercial Code ("U.C.C."), which states that "a secured party shall use reasonable care in the custody and preservation of collateral in the secured party's possession. In the case of chattel paper or an instrument, reasonable care includes taking necessary steps to preserve rights against prior parties unless otherwise agreed." Ky. Rev. Stat. Ann. § 355.9-207. Whether a secured party's duty to preserve collateral applies to pledged shares is an issue of first impression in Kentucky. Because our jurisdiction in this case is based on a diversity of citizenship among the parties, "[w]e are in effect sitting as a state appellate court in Kentucky, with the obligation to decide the case as we believe the Kentucky Supreme Court would do." *Stalbosky v. Belew*, 205 F.3d 890, 893 (6th Cir. 2000). As the district court noted below, although Kentucky courts have not reviewed the matter, several courts around the country have addressed the issue of whether § 9-207 applies to pledged stock. Before analyzing their holdings, however, we begin our analysis with the U.C.C. itself.

The comment to § 9-207 states that the provision "imposes a duty of care, similar to that imposed on a pledgee at common law, on a secured party in possession of collateral," and cites to §§ 17-18 of the Restatement of Security. U.C.C. § 9-207 cmt. 2. Section 17 of the Restatement is essentially identical to the first sentence of § 9-207, and its accompanying explanatory comment states that "[t]he rule of reasonable care expressed in this Section is confined to the *physical care* of the chattel, whether an object such as a horse or piece of jewelry, or a negotiable instrument or document of title." Restatement of Security § 17 cmt. a (1941) (emphasis added). Section 18 of the Restatement mirrors the second sentence of § 9-207 and addresses "instruments representing claims of the pledgor against third persons." Restatement of Security § 18. Though it deals with negotiable instruments rather than equity investments, § 18 sheds light on the topic of preserving collateral value. Specifically, the explanatory comment accompanying the section states "[t]he pledgee is not

---

[6]If the full $2.8 million credit line was used, the market price of the 410,000 shares would need to be approximately $16.89 in order to maintain an LTV ratio of 40%. In July, the shares were sold at an average price of $1.28 over the four-day period. The LTV ratio at the time the collateral was sold was approximately 530%.

liable *for a decline in the value* of pledged instruments, even if timely action could have prevented such decline." Restatement of Security § 18 cmt. a (1941) (emphasis added). In the context of pledged stock, courts have used this language from the Restatement to hold that "a bank has no duty to its borrower to sell collateral stock of declining value." *Capos v. Mid-Am. Nat'l Bank*, 581 F.2d 676, 680 (7th Cir. 1978). *See also Tepper v. Chase Manhattan Bank, N.A.*, 376 So. 2d 35, 36 (Fla. Dist. Ct. App. 1979) (holding that "a pledgee is not liable for a decline in the value of pledged instruments"); *Honolulu Fed. Sav. & Loan Ass'n v. Murphy*, 753 P.2d 807, 816 (Haw. Ct. App. 1988) (finding that a lender has no duty to preserve the value of pledged securities by financially supporting the issuing company); *FDIC v. Air Atl., Inc.*, 452 N.E.2d 1143, 1147 (Mass. 1983) (finding a lender not liable for the "ruinous" decline in the market value of pledged stock); *Marriott Employees' Fed. Credit Union v. Harris*, 897 S.W.2d 723, 728 (Tenn. Ct. App. 1995) (holding that the duty of reasonable care "refers to the physical possession of the stock certificates" and does not impose liability for depreciation in value); *Dubman v. N. Shore Bank*, 271 N.W.2d 148, 151 (Wisc. Ct. App. 1978) (concluding that "our law does not hold a pledgee responsible for a decline in market value of securities pledged to it as collateral for a loan absent a showing of bad faith or a negligent refusal to sell after demand"). As the Seventh Circuit stated, "[i]t is the borrower who makes the investment decision to purchase stock. A lender in these situations merely accepts the stock as collateral, and does not thereby itself invest in the issuing firm."[7] *Capos*, 581 F.2d 680. "Given the volatility of the stock market, a requirement that a secured party sell shares . . . held as collateral, at a particular time, would be to shift the investment risk from the borrower to the lender." *Air Atl., Inc.*, 452 N.E.2d at 1147.

We agree with the reasoning of these courts and believe that the Kentucky Supreme Court would adopt a similar approach with regards to Ky. Rev. Stat. Ann. § 355.9-207. Specifically, we conclude that under Kentucky law a lender has no obligation to sell pledged stock held as collateral merely because of a market decline. If the borrower is concerned with the decline in the share value, it is his responsibility, rather than that of the lender, to take appropriate remedial steps, such as paying off the loan in return for the collateral, substituting the pledged stock with other equally valued assets, or selling the pledged stock himself and paying off the loan.[8]

---

[7]As noted by the district court, the few courts which have found differently involved cases in which the securities held as collateral were convertible debentures, and the secured party failed to covert them into stock. *Reed v. Cent. Nat'l Bank*, 421 F.2d 113, 118 (10th Cir. 1970); *Grace v. Sterling, Grace & Co.*, 289 N.Y.S.2d 632, 638 (N.Y. App. Div. 1968). The courts in those cases held that § 9-207 requires the pledgee to take the necessary steps to preserve the value of the securities. As the district court correctly noted, however, "the losses occasioned by the secured creditor's failure to convert the debentures were clearly foreseeable, because the creditors had specific knowledge of an event that would materially affect the value of the securities." J.A. at 260-61 n.7 (Dist. Ct. Order). By contrast, where the collateral held by the secured party is stock, "there is no similar, pre-defined event which the creditor knows will impact the value of the stock." J.A. at 261 n.7 (Dist. Ct. Order). Because the fluctuation in value is not foreseeable, to require a creditor to preserve value of stock is to "foist that role [of investment adviser] upon it." *Capos*, 581 F.2d at 680.

[8]Johnson argues that these options were not available to him in this case because he did not have other assets to substitute and was unable to sell the stock on his own because of his insider status. Appellant's Reply Br. at 13-14. Particularized facts of the borrower's situation, however, are insufficient to alter the law and burden the lender with the responsibility of being an investment adviser. The fact that the borrower adopted a risky investment strategy does not transform the legal obligations of the lender unless explicitly specified in the contract. Moreover, the record does not support Johnson's contention that he could not avail himself of other options to preserve the value of his collateral. Johnson had other assets which he could have substituted for the collateral stock. In his deposition, Johnson stated that his house in Las Vegas was valued at around $5.0 million and was free of any mortgages and encumbrances. J.A. at 591-92 (Johnson Dep.). Discussions were held between Bank One and Johnson during the months of April and May specifically about using the Las Vegas house as additional collateral. Furthermore, despite the fact that he was an insider, Johnson could have sold his restricted stock through a Rule 144 transaction so long as he ensured the sale was

In his brief, Johnson attempts to distinguish his case from the several cases outlined above, by arguing that in the situation where a loan is *over-secured*, the pledgee has a duty to preserve the surplus. Johnson argues that where a loan is over-secured, the amount of collateral greater than the loan value belongs to the borrower and a duty should be imposed on the secured party to protect that surplus because the secured party has no incentive to do so on its own. By contrast, Johnson argues, where a loan is *under-secured*, the secured party's incentive is the same as that of the borrower, and thus no statutory duty to preserve the value of the collateral is necessary. In support of his argument, Johnson cites to two district court opinions which distinguish between over-secured and under-secured loans. Unfortunately, his theory is neither supported by these cases nor compelling on its own.

Generally, the dual purpose of collateral is to secure financing for the borrower and hedge against credit risk for the lender. Where a lender extends credit solely on the basis of *over-secured* collateral, it is because of perceived heightened risk, and therefore over-collateralization provides the lender with more flexibility. In this case, Bank One agreed to loan Johnson $2.8 million dollars only if he pledged two-and-a-half times that value in PurchasePro stock, or $6.9 million. The underlying rationale was that unless the surplus value was included, the collateral may be insufficient at the time of any default. The LTV ratio was to provide a cushion so that Bank One could either wait for the stock to rebound, restructure the loan, solicit additional collateral, or call the loan with enough time to sell the stock to recoup the value. If accepted, Johnson's argument would bifurcate the collateral amount between the actual value of the loan and the surplus value, and impose a duty upon the lender to preserve the latter. Requiring preservation of the surplus value, however, leaves only the actual value of the loan to serve as collateral and wipes out any flexibility for the lender. Under Johnson's theory, Bank One would have had only $2.8 million worth of stock as collateral for the $2.8 million loan and would have been required to preserve the remaining $4.1 million of surplus. On the first day the market value of the stock fell below the LTV requirement, Bank One would have called the loan or risked liability under § 9-207. Imposing automatic liability for the decreased value of the surplus defeats the inherent purpose of requiring over-collateralization in the first place.

The two cases Johnson cites for support do not stand for the proposition that over-collateralization necessarily implies a duty of the lender to preserve, but rather suggest that the borrower does have a valid interest in the surplus value and therefore his wishes should not be ignored in over-collateralized situations. In *Fidelity Bank & Trust Co. v. Production Metals Corp.*, 366 F. Supp. 613, 618 (E.D. Pa. 1973), the district court found that "where the value of the collateral exceeds the amount of the debtor's entire obligation . . . there is no justification for a rule authorizing the pledgee to disregard [the pledgor's] interest in the collateral and deprive him of the right to control its disposition for the benefit of both parties." The district court noted that where the pledgee, "*upon request of the pledgor*" fails to take steps to preserve the value of the collateral, "a question should properly be raised as to whether the pledgee has exercised reasonable care under the circumstances." *Id.* (emphasis added). The *Fidelity* court noted, however, that "where the entire obligation of the pledgor exceeds the value of the collateral held by the pledgee . . . the pledgee's refusal to sell the collateral upon request of the pledgor would not, as a matter of law, constitute a breach of his duty to preserve its value." *Id.* at 619. Similarly, in *FDIC v. Caliendo*, 802 F. Supp. 575, 583-84 (D.N.H. 1992), the district court, citing *Fidelity Bank*, ruled that a pledgor could bring a claim under § 9-207, where there is an over-collateralized loan, a default by the pledgor, and "the

---

not a result of any material, non-public information. 17 C.F.R. § 230.144(b). *See, e.g.*, J.A. at 513-16 (Layne's Stock Selling Plan). Johnson stated in his deposition that he was intending to sell his restricted shares pursuant to a selling plan, the proceeds of which he would use "to pay [Bank One] off one hundred percent." J.A. at 591 (Johnson Dep.). Unfortunately, the sale of Johnson's shares under the plan was triggered by the stock reaching a certain price, which it never did.

receipt of a reasonable request by the pledgor/borrower to either sell or have the stock redeemed." These two cases do not provide any support for Johnson's argument that a duty to preserve collateral arises simply because of an over-collateralized situation; rather, where there is over-collateralization *and the pledgor has requested liquidation*, the pledgee should respect the pledgor's interest in the surplus value. These two cases are inapposite to Johnson's case, because the record is clear that he never made a request to the bank to sell the collateral to preserve his surplus, but rather urged Bank One as late as May 1, 2001, to do the opposite.

In sum, we conclude that, under Kentucky law, a lender is not under any duty or obligation to sell collateral in its possession merely because the collateral is declining in value, regardless of whether the loan is over-collateralized. Therefore, the district court's grant of summary judgment on this issue is affirmed.

## C. Commercially Reasonable Disposition

Johnson's second argument raised on appeal is that Bank One violated Kentucky law by failing to dispose of the PurchasePro stock in a commercially reasonable manner. Following the U.C.C., Kentucky law requires that "[e]very aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable." Ky. Rev. Stat. Ann. § 355.9-610. The purpose of the provision is to protect the debtor's interest by ensuring he will "receive the market price of his collateral." *Ocean Nat'l Bank v. Odell*, 444 A.2d 422, 426 (Me. 1982). The law also provides a "recognized market" safe harbor, which states that:

> [a] disposition of collateral is made in a commercially reasonable manner if the disposition is made:
> (a) In the usual manner on any recognized market;
> (b) At the price current in any recognized market at the time of disposition; or
> (c) Otherwise in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition.

Ky. Rev. Stat. Ann. § 355.9-627(2). The U.C.C. comments define a "recognized market" as "one in which the items sold are fungible and prices are not subject to individual negotiation. For example, the New York Stock Exchange is a recognized market." U.C.C. § 9-610 cmt. 9. Sales on a recognized market are commercially reasonable "because the price on the recognized market represents the fair market value [of the collateral] from day to day." *Nelson v. Monarch Inv. Plan of Henderson, Inc.*, 452 S.W.2d 375, 377 (Ky. 1970); *see also FDIC v. Blanton*, 918 F.2d 524, 527-28 (5th Cir. 1990) ("A recognized market assures a fair price through neutral market forces, and thus obviates the debtor's need for protection through redemption, appraisal, or monitoring the sale."). Therefore, where the collateral is sold in a recognized market, Kentucky courts have found the transaction to be commercially reasonable as a matter of law. *Bailey v. Navistar Fin. Corp.*, 709 S.W.2d 841, 842 (Ky. Ct. App. 1986). Courts in other states have held similarly that a sale on a recognized market is per se commercially reasonable. *See Blanton*, 918 F.2d at 529 (noting that under Texas law, sale of collateral on a recognized market is commercially reasonable); *Suffield Bank v. LaRoche*, 752 F. Supp. 54, 59 (D.R.I. 1990) (holding that the sale of pledged stock on the American Stock Exchange "ensured that its sale was commercially reasonable and beyond the scrutiny of this Court"). Moreover, the law provides that "[t]he fact that a greater amount could have been obtained by . . . disposition . . . at a different time or in a different method from that selected by the secured party is not of itself sufficient to preclude the secured party from establishing that the . . . disposition . . . was made in a commercially reasonable manner." Ky. Rev. Stat. Ann. § 355.9-627(1).

Applying the U.C.C. provisions to this case, the district court was correct to find that Bank One's disposition of the PurchasePro shares through a sale on the NASDAQ national market was

commercially reasonable.  Johnson rehashes his arguments about preserving collateral value to contend that delaying the sale of the pledged stock from February was commercially unreasonable. Appellant's Br. at 45.  Johnson's argument, however, misinterprets the statute.  Section 9-610 does not impose an obligation on a lender to liquidate and sell the collateral stock at a specific time during the life of the loan.  Put another way, § 9-610 does not address *whether* a lender should dispose of its collateral, but rather once that decision has been made, *how* the disposition should occur.  When Johnson's loan fell below the LTV ratio, Bank One attempted to restructure the loan and secure additional collateral rather than sell the shares.  Under the pledge agreement and Kentucky law, Bank One was not under any obligation to sell the stock at that point.  In late May, after repeated negotiations with Johnson fell through, Bank One decided to begin the liquidation process, which was completed by July.[9]  The sale of the stock was on the NASDAQ, a recognized market, and thus ensured that Johnson received the fair market value for his stock shortly after the decision to liquidate was made, which is all that § 9-610 requires.[10]  Therefore, we conclude that the sale of Johnson's PurchasePro stock was commercially reasonable and the district court's grant of summary judgment on this issue is affirmed.

---

[9]Johnson argues in the alternative that the delay from the time of the liquidation decision in May until July was commercially unreasonable because the stock value dropped during these months.  This argument is similarly unpersuasive.  As § 355.9-627(1) states, the mere fact that a higher value could have been obtained earlier, by itself, is not sufficient to show that a transaction was commercially unreasonable.  Moreover, there is no evidence in the record that Bank One unreasonably delayed the sale of the stock.  The record demonstrates that during the month and a half between the decision to liquidate and the actual sale, Bank One was in discussions with PurchasePro's counsel to ensure that the sale of stock owned by Layne and Johnson was not in violation of any securities laws.  Specifically, Bank One delayed the sale to ensure compliance with Rule 144 requirements.  17 C.F.R. § 230.144(b); *see Rice v. Liberty Surplus Ins. Corp.*, Nos. 03-6071, 03-6091 & 03-6092, 2004 WL 2413393, at *3 (6th Cir. Oct. 28, 2004) (noting that under Rule 144 restricted stock may not be sold unless issuing corporation files a letter with the SEC certifying that the conditions of the rule have been met).  Because the stock was lightly traded in the market, the shares were sold over a four-day period to avoid dumping a large block and further depressing the price.  Such a delay is not commercially unreasonable. Finally, Johnson's argument rests on the unproven assumption that Bank One should have known that a delay in the sale of the shares would *necessarily result* in a lower market value.  PurchasePro shares were highly volatile, and it was plausible that the price could have rebounded.  As a result, it could be commercially reasonable for Bank One to have delayed the sale to see if the market would return.  *See* U.C.C. § 9-610 cmt. 3 (explaining that the U.C.C. "does not specify a period within which a secured party must dispose of collateral," because there may be times when it is "prudent not to dispose of goods when the market has collapsed").

[10]Johnson argues that the recognized-market exception cannot be per-se reasonable as to timing because it would allow a lender to delay potentially a sale for years, which would be an unreasonable result.  Appellant's Br. at 45. We need not address the issue about whether a disposition of collateral on a recognized market is per-se reasonable, because the facts in this case reveal that Bank One sold the stock shortly after negotiations with Johnson broke down, after ensuring compliance with the securities laws and taking into account market volume.  *See supra* note 9.  Addressing Johnson's issue, however, in the situation where a loan has been called, the lender has an incentive to sell the collateral for the greatest value possible so as to pay off the outstanding debt.  The situation where a lender would hold off on the sale of collateral until the price drops precipitously and thereby risk the ability to recover its loan would be rare.  The comment to § 9-610 states, however, that where a secured party does not dispose of collateral and "there is no good reason for not making a prompt disposition, the secured party may be determined not to have acted in a 'commercially reasonable' manner."  U.C.C. § 9-610 cmt. 3.  Though the language seems at odds with § 9-627(a), the comment to that section states there is no inconsistency, but rather while a low price is insufficient of itself to prove commercial unreasonableness, in such a situation "a court should scrutinize carefully all aspects of a disposition to ensure that each aspect was commercially reasonable."  U.C.C. § 9-627 cmt. 2.  Despite this language, courts have been reluctant to second-guess the timing of the disposition of collateral in most situations, even where the price has declined precipitously.  *See, e.g.*, *Air Atl. Inc.*, 452 N.E.2d at 1147 (finding that a five-year delay from the decision to liquidate until the actual sale of stock was not commercially unreasonable, even where "the market declined 'ruinously' and the decline was 'notorious'").

**D. Breach of Fiduciary Duty**

The third argument Johnson raises on appeal is that Bank One breached a fiduciary duty by failing to sell the PurchasePro stock when the LTV ratio exceeded 40%. Under Kentucky law, a fiduciary relationship is "founded on trust or confidence reposed by one person in the integrity and fidelity of another and which also necessarily involves an undertaking in which a duty is created in one person *to act primarily for another's benefit* in matters connected with such undertaking." *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 485 (Ky. 1991) (emphasis added). In interpreting Kentucky law, we have held that "[e]xcept in special circumstances, a bank does not have a fiduciary relationship with its borrowers." *Sallee v. Fort Knox Nat'l Bank, N.A.*, 286 F.3d 878, 893 (6th Cir. 2002). We have stated that:

> banks do not generally have fiduciary relationships with their debtors. This flows from the nature of the creditor-debtor relationship. As a matter of business, banks seek to maximize their earnings by charging interest rates or fees as high as the market will allow. Banks seek as much security for their loans as they can obtain. In contrast, debtors hope to pay the lowest possible interest rate and fee charges and give as little security as possible. Without a great deal more, a mere confidence that a bank will act fairly does not create a fiduciary relationship obligating the bank to act in the borrower's interest ahead of its own interest.

*Id.* As one court noted, "it would be absurd to think that [a bank] could never take its own interests into account, or that [the borrowers'] interest had to be absolutely paramount at all times and in all situations." *Harris v. Key Bank Nat'l Ass'n*, 193 F. Supp. 2d 707, 717 (W.D.N.Y. 2002). That court concluded, "[o]bviously it would have been in [the borrowers'] best interests for [the bank] simply to have forgiven their debt altogether, but the law imposes no duty on a creditor to do so." *Id.*

Applying these principles to this case, we conclude that Bank One did not breach a fiduciary duty owed to Johnson by failing to sell the collateral stock earlier. Johnson relies on language in the pledge asset agreement which authorized Bank One "as my agent and attorney in fact to buy, sell . . . and trade" securities. J.A. at 399 (Pledge Asset Agmt.). The agreement also states that Bank One "as attorney in fact is authorized to act for me and in my behalf in the same manner and with the same force and effect as I might or could do." J.A. at 399 (Pledge Asset Agmt.). Johnson contends that the effect of this language is to create a fiduciary relationship where Bank One must act in his best interests. In his deposition, Johnson stated that he believed the language created an automatic trigger whereby Bank One was obligated to sell the stock if the LTV ratio exceeded 40% because he "did not want to get [his] personal opinion or feelings at the time involved." J.A. at 566 (Johnson Dep.). Indeed, it appears from his deposition that Johnson viewed the agreement similar to a stop-order transaction, whereby the stock would be sold if it fell below a certain value.

While that might have been Johnson's intention, the agreement did not reflect it. The language which Johnson cites in his brief does not create a fiduciary relationship, but rather merely authorizes Bank One to trade his stock. Nowhere in the agreement does it say that Bank One's trading must be done in Johnson's best interests. In fact, the commercial pledge and security agreement explicitly states otherwise — in the event of default, "Lender *may exercise* any one or more of the [prescribed] rights and remedies." J.A. at 353 (Comm. Pledge & Sec. Agmt.) (emphasis added). One of the prescribed remedies in the event of a default is "[s]ell the Collateral, *at Lender's discretion*." J.A. at 353 (Comm. Pledge & Sec. Agmt.) (emphasis added). "Lender *shall not be obligated* to make any sale of Collateral regardless of a notice of sale having been given." J.A. at 353 (Comm. Pledge & Sec. Agmt.) (emphasis added). The language clearly sets forth that Bank One entered into the loan agreement with Johnson with the sole intention to act in the best interests of its shareholders. Pursuant to that intention, Bank One determined that it was better to add collateral and maintain the loan rather than call it in and sell the shares.

Because neither Kentucky law nor the contract created a fiduciary relationship between the parties, we affirm the district court's grant of summary judgment to Bank One on this issue.

## E. Breach of Contract and the Implied Covenant of Good Faith

Johnson's next argument on appeal is that Bank One is liable for breach of contract or for breach of the implied covenant of good faith. Rather than providing new arguments, Johnson restyles his earlier ones into contract claims. Specifically, he argues that because Bank One had a duty to preserve the value of the collateral and parties cannot contract away U.C.C. duties, Bank One is liable for a breach of contract. Appellant's Br. at 58. Having concluded that U.C.C. § 9-207 does not impose such a duty on a secured party, we affirm the grant of summary judgment on the breach of contract claim.

Similarly, with regards to the breach of the implied covenant of good faith, Johnson argues that under the objective standard of good faith prescribed by the U.C.C., parties must act in "observance of reasonable commercial standards of fair dealing." Ky. Rev. Stat. Ann. § 355.9-102(1)(aq). Restyling his earlier arguments about commercial reasonableness, he argues that it was unreasonable for Bank One not to have called the loan earlier and sold the collateral stock, and therefore it acted in bad faith. Having concluded that Bank One was not obligated to preserve the value of the collateral, that it acted in a commercially reasonable manner in disposing of the collateral, and that it did not owe a fiduciary duty to Johnson, we hold that Bank One did not breach the implied covenant of good faith, and therefore the grant of summary judgment on this issue is affirmed as well.

## F. Bank One's Counterclaims

Finally, Johnson appeals the grant of summary judgment to Bank One on its counterclaim for the deficiency on the loan. Johnson failed to raise any arguments other than the ones dismissed above about why Bank One should not prevail on its collection claims. As the district court noted, Johnson has not "disputed [that he] knowingly and willingly executed the loan agreements in question or that he defaulted on the loans." J.A. at 270 (Dist. Ct. Order). Accordingly, we affirm the grant of summary judgment on this issue as well.

## III. CONCLUSION

In summary, we conclude that none of issues Johnson raises on appeal are compelling, and therefore we **AFFIRM** the grant of summary judgment in favor of Bank One.